**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Criminal Case No. 05-cr-00545-EWN

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.      JOSEPH P. NACCHIO,

      Defendant.

---

**UNITED STATES' MOTION TO EXCLUDE**
**TESTIMONY BY DANIEL FISCHEL**

---

The United States moves to exclude the testimony of Professor Daniel Fischel.

**INTRODUCTION**

Defendant provided its revised expert disclosure regarding Professor Daniel Fischel on Thursday, March 29, 2007. *See* Exhibit 1. Based on that disclosure, Professor Fischel should be excluded as an expert witness, for several reasons.

First, Defendant still has not complied with the expert disclosure rules. Despite the breadth of Defendant's prior disclosure on March 16, 2007, which appeared to be an attempt by Defendant to keep Professor Fischel's options open, Defendant now attempts to slip in several opinions that do not even fall within the broad topics of that prior disclosure. And while Defendant has now provided a long list of Professor Fischel's

opinions, he has failed – despite's the Court's clear warning — to set forth the "reasons" and "bases" for the opinions, as required.  *See* Fed. R. Crim. P. 16(b)(1)(C).

Second, Defendant has not shown that Professor Fischel's testimony is admissible. The vast majority of Professor Fischel's opinions are simply comments on the evidence — comments that are well within the jury's understanding and would not assist the jury.  *See* Fed. R. Evid. 702.  Although Professor Fischel is a well-known law professor who has familiarity with economics in general, there is no showing that he is qualified to serve as an economic expert as to the particular matters on which Defendant wishes to have him offer opinions in this case.  *See* Fed. R. Evid. 702.  The disclosure also does not show that Professor Fischel used a reliable methodology in reaching his opinions.  The disclosure is essentially a list of facts and conclusions – with nothing in between.  There is no suggestion that Professor Fischel actually selected any reliable principles and applied them reliably to the facts, as he must.  *See* Fed. R. Evid. 702(2), (3).  And in many instances, the facts from which these conclusions are drawn are not even close to the ones that an expert in the relevant field would actually rely upon.  *See* Fed. R. Evid. 702 (1), 703.  What is plain from this disclosure is that Professor Fischel is going to be called to testify not to provide "expert opinions" but to present and emphasize *facts* — which he is not competent to do because the facts are not within his personal knowledge.  *See* Fed. R. Evid. 602.

Third, several of the facts and conclusions that Professor Fischel sets forth are entirely irrelevant.  *See* Fed. R. Evid. 401, 402.  Most of these "opinions" pose a significant danger of confusing or misleading the jury, or wasting their time and causing needless delay.  *See* Fed. R. Evid. 403.

This brief proceeds as follows.  First, it sets forth the relevant standards under Federal Rule of Civil Procedure 16 and Federal Rules of Evidence 401, 403, 602, 702, and 703, and discusses the particular case law that is most applicable here.  Second, it discusses Professor Fischel's qualifications as set forth in the disclosure and on his curriculum vitae.  Third, it proceeds opinion by opinion through Defendant's latest disclosure.  Fourth, it explains why exclusion is warranted.  A table of contents is provided on the following page.

# TABLE OF CONTENTS

I.    STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    A.    Fed. R. Crim. P. 16(b)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    B.    Fed. R. Evid. 602. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    C.    Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        1.    The testimony must assist the jury... . . . . . . . . . . . . . . . . . . . . . . . . 9
        2.    The witness must be qualified as an expert on the particular
            issue as to which he is to offer an opinion. . . . . . . . . . . . . . . . . . . . 11
        3.    The opinions must be based on reliable principles or methods.. . . . 13
        4.    The witness must apply the principles and methods reliably to
            the facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        5.    The opinion must be based upon proper facts and data... . . . . . . . 17
    D.    Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.    THE QUALIFICATIONS DISCLOSED FOR PROFESSOR FISCHEL. . . . . . 20

III.    THE SPECIFIC "EXPERT OPINIONS". . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    A.    Paragraph 5 - Whether Defendant's sales were on the basis of material
        nonpublic information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        1.    Paragraph 5A - Sales in prior quarters. . . . . . . . . . . . . . . . . . . . . . 22
        2.    Paragraph 5B - Consistency of sales with stated preference. . . . . . 25
        3.    Paragraph 5B - Incentives to sell growth shares.. . . . . . . . . . . . . . 27
        4.    Paragraph 5C - consistency of sales with alleged prior
            statement and Board request. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        5.    Paragraphs 5D, 5F, 5G, 5H - Defendant's incentive to sell more. . 32
        6.    Paragraph 5E - Defendant's incentives in BellSouth transaction. . . 35
        7.    Paragraph 5I - Sales were consistent with diversification... . . . . . . 38
        8.    Paragraph 5J, 5K - Sales by others. . . . . . . . . . . . . . . . . . . . . . . . . 40

    B.    Paragraph 6 - Qwest guidance and performance. . . . . . . . . . . . . . . . . . . . 42
        1.    Paragraph 6 - Consistency of performance with guidance. . . . . . . . 42
        2.    Paragraph 6 - Failure to meet guidance reflected a
            "massive downturn in the industry".. . . . . . . . . . . . . . . . . . . . . . . . . 44

    C.    Paragraph 7 - Information regarding magnitude of IRUs would not have
        been material to a reasonable investor. . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

III.   THE COURT SHOULD EXCLUDE THE TESTIMONY................... 56

    A.   Defendant has not complied with the disclosure requirements.. ........ 56

    B.   The testimony is inadmissible on numerous grounds.................. 58

    C.   If the Court is inclined to permit any testimony by Professor Fischel, it should grant additional disclosure and then hold an evidentiary hearing.. ............................................... 59

CONCLUSION.................................................... 60

# I.     STANDARDS

## A.     Fed. R. Crim. P. 16(b)(1)(C)

Defendant's updated disclosure fails to provide, for each opinion to be offered by Professor Fischel, the reasons and bases for his opinions.  In addition, the disclosure presents several new opinions that were not even covered by the broad topics of Defendant's original disclosure.

The disclosure thus violates Federal Rule of Criminal Procedure 16(b)(1)(C).  That rule provides that where a defendant has requested expert disclosure from the government, the defendant must himself provide to the government "a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence."  Fed. R. Crim. P. 16(b)(1)(C).  The Rule further provides, "*The summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications*."  *Id.* (emphasis added).  This disclosure is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony though focused cross-examination."  *See* 1993 Adv. Comm. Notes to Fed. R. Crim. P. 16.

An expert disclosure thus must include more than just expert opinions.  It must "describe" the "reasons" for the opinions as well as the "bases" for the opinions, which must "cover ... any information that might be recognized as a legitimate basis for an

opinion under Federal Rule of Evidence 703, including opinions of other experts."  1993

Adv. Comm. Notes to Fed. R. Crim. P. 16(b)(1)(C).

This disclosure requirement is similar to the disclosure requirements in civil

actions.  *See* 1993 Adv. Comm. Notes to Fed. R. Evid. 705 (noting the revisions to "Rules

26(a)(2)(B) and 26(e)(1) of the Federal Rules of Civil Procedure [and] revised Rule 16 of

the Federal Rules of Criminal Procedure, which require disclosure in advance of trial of

the basis and reasons for an expert's opinion").

As the Court has observed, Defendant's initial disclosure "offer[ed] no bases or

reasons whatsoever for Professor Fischel's opinions contained in the summary."  *See*

Docket No. 297 at 4.   As set forth in Part III below, the updated disclosure includes

several opinions, but still fails to describe the reasons and bases for those opinions.

### B.      Fed. R. Evid. 602

The disclosure also makes clear many of the "opinions" to be expressed by

Professor Fischel are simply facts.  But an expert witness cannot simply tell the jury facts

as if he had personal knowledge.  To testify as to facts, a witness must have personal

knowledge.  *See* Fed. R. Evid. 602.

This restriction on using an expert to testify about facts was discussed in

*Champagne Metals v. Ken-Mac Metals*, 458 F.3d 1073 (10th Cir. 2006), where the Tenth

Circuit affirmed the district court's exclusion of an economist's testimony.  The court

noted that "generally, an economist's role in an antitrust case is not to prove facts, but to

opine on economic theory." *Id.* at 1080 n.4.  The court noted that could not find any statement in the economist's disclosure or deposition "that made clear that he was only assuming the facts he asserted." *Id.*  The court observed, rather, that statements in the economist's report as to certain facts "sound[ed] like a *confirmation* (rather than an *assumption*)" of those facts. *Id.*  The court noted that the economist's report nowhere indicated that he was simply assuming facts, rather than asserting them. *See id.* (observing that the economist's report "nowhere makes clear that [the expert] is merely 'assuming' that Champagne had trouble hiring," but instead "states that Champagne 'experienced difficulty acquiring sales persons'").  The court ruled that the district court had properly excluded the economist's testimony, and observed that the testimony "lacked foundation" and might "not assist the trier of fact at all and, instead, may simply result in confusion." *Id.  See also Law v. NCAA,* 185 F.R.D. 324, 341 (D. Kan. 1999) (ruling that an expert economist could not testify "as a channeler, seeking to present non-expert, otherwise inadmissible hearsay through the mouth of an economist"); C. Wright *et al.*, Federal Practice & Procedure § 6025 (2007 ed.) ("When experts testify as to facts or other matters which do not constitute expert opinions, Rule 703's exemption from the personal knowledge requirement does not apply.").

    **C.**    **Fed. R. Evid. 702**

    A witness may offer an expert opinion only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods,

and (3) the witness has applied the principles and methods reliably to the facts of the case."  *See* Fed. R. Evid. 702.   "In *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),] the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* [*Tire Co. v. Carmichael*, 526 U.S. 137 (1999)] clarified that this gatekeeper function applies to all expert testimony."  2000 Advisory Committee Notes to Fed. R. Evid. 702.

The Tenth Circuit has explained the district court's gatekeeper function as follows:

> To determine whether an expert opinion is admissible, the district court performs a two-step analysis.  First, the court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion.  *See* Fed. R. Evid. 702. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable under the principles set forth in *Daubert*.

*103 Investors, L.P. v. Square D. Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

The burden is on Defendant to establish that Professor Fischel's testimony is admissible.  2000 Adv. Comm. Notes to Fed. R. Evid. 702 (explaining that pursuant to Federal Rule of Evidence 104(a), "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

### 1.     The testimony must assist the jury.

Expert testimony is inadmissible unless it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (the testimony must "aid the jury in resolving a factual dispute").

In making this determination, it is proper to consider whether the opinion the expert proposes to offer is within or beyond the jury's knowledge.  See *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (observing that a court may consider whether the testimony is "within the juror's common knowledge and experience").   One factor is whether counsel can readily raise the issue at trial without expert testimony.  *See id.* at 1126 (10th Cir. 2006) (holding that the testimony of a psychologist about the unreliability of eyewitness identification was properly excluded by the district court where it was not "outside the juror's common knowledge and experience" and where trial counsel "amply exposed the common-sense deficiencies in the prosecution's identification case").

An expert is not allowed to simply comment to the jury on what basic inferences should be drawn in areas where the jury is capable of drawing those inferences for itself. *Id.* at 1123 (observing that a court may consider whether the testimony "will usurp the juror's role of evaluating a witness's credibility"); *Gust v. Jones*, 162 F.3d 587, 594 (10th Cir. 1998) (affirming the district court's exclusion, as not helpful to the jury, of a proposed accident reconstruction expert where there was eyewitness testimony and other evidence from which the jury could draw its own conclusions about the accident); *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932 (10th Cir. 1994) (affirming the

district court's exclusion of an insurance expert on the bad faith denial of insurance claims, and explaining that such testimony was on an "issue that a jury is capable of assessing for itself").

> 2. **The witness must be qualified as an expert on the particular issue as to which he is to offer an opinion.**

To offer expert opinions, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Such opinions "must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." 2000 Adv. Comm. Notes to Fed. R. Evid. 702.

The Court must do more than just determine whether the witness is an expert within some general area. Rather, the Court must focus on whether the expert has been shown to have *specific* expertise in the area at issue that qualifies him as an expert with respect to the *specific* opinions he intends to offer. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (explaining that the issue was not whether qualified tire experts exist, but "whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case") (internal quotation marks omitted); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1227 (10th Cir. 2003) (explaining that "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine

11

scientist") (internal quotation marks omitted); *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999) (observing that even a "supremely qualified expert cannot waltz into the courtroom and render opinions" unless the opinions are relevant and reliable).

In making this inquiry, the Court must identify the relevant area of expertise at issue for the opinion and then consider what the expectations are in that area of expertise. For example, in many areas of expertise, there are certain expectations of academic rigor. *See* 2000 Adv. Comm. Notes to Fed. R. Evid. 702 (noting that some disciplines are "subject to the expectations of falsifiability, peer review, and publication").

The Court should also consider whether the area of expertise is a single unitary field, or one in which there are subspecialties. As Judge Posner has observed, "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science. A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer." *Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002).

As discussed in more detail below, it appears that Professor Fischel is being offered as a scholar of law and economics, rather than a person with professional experience (such as a financial analyst, an investor, or a telecommunications industry expert). The United States notes, however, that even if Professor Fischel were offered as

12

an expert based on some experience, the Court would still need to determine whether he was indeed an expert with knowledge relevant to the opinions sought to be expressed. Rule 702, as amended in 2000, "rejects the premise that an expert's testimony should be treated more permissively simply because it is outside the realm of science.  An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist."  2000 Adv. Comm. Notes to Fed. R. Evid. 702; *Goebel v. Denver & Rio Grande W. R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) (observing that "[i]t is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate").

### 3.    The opinions must be based on reliable principles or methods.

Rule 702 provides that expert testimony must be "the product of reliable principles and methods."  *See* Fed. R. Evid. 702(2).  Thus, even where a witness is qualified to serve as an expert, the witness thus cannot simply set forth a set of conclusions.

In short, an expert's say-so is not enough.  "The trial court's gatekeeping function requires more than simply 'taking the defendant's word for it.'"  2000 Adv. Comm. Notes for Fed. R. Evid. 702 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (internal quotation marks omitted); *see also Daubert*, 43 F.3d at 1319

13

("We've been presented with only the expert's qualifications, their conclusions and their assurances of reliability.  Under *Daubert*, that's not enough.") (quoted with approval in the 2000 Adv. Comm. Notes to Fed. R. Evid. 702).

The Court thus must scrutinize any proposed opinions to ensure that "reliable principles or methods" were employed in reaching the opinion.  Fed. R. Evid. 702(2); *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (the court must examine not just the conclusions, but "the methodology employed in reaching those conclusions"); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1226 (10th Cir. 2003) (ruling that the district court erred in admitting a geologist's testimony because at the *Daubert* hearing, the court made no mention of the geologist's "reasoning or the reliability of his methodology," including "how or why he arrived at his conclusion that [a particular text] was the proper source to establish baselines" for certain soil and water characteristics).

In *Daubert*, the Supreme Court set forth several non-exclusive factors that may be considered in evaluating reliability.  "The specific factors explicated by the *Daubert* Court are (1) whether the expert's technique or theory can be or has been tested — that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the

14

technique or theory has been generally accepted in the scientific community." 2000 Advisory Committee Notes to Fed. R. Evid. 702.

The 2000 Advisory Committee Notes to Rule 702 identify several other factors that are often relevant. A court may consider whether the expert (1) "developed [his] opinions expressly for the purpose of testifying," (2) "has unjustifiably extrapolated from an accepted premise to an unfounded conclusion," (3) "has adequately accounted for alternative explanations," and (4) "is being as careful as he would be in his regular professional work outside his paid litigation consulting." 2000 Adv. Comm. Notes to Fed. R. Evid. 702. It also may consider whether the expert's opinions are based on speculation, rather than application of reliable principles. *See Goebel,* 215 F.3d at 1088 ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate.").

If the expertise is in a field where academic papers are published, courts often consider whether the expert has shown that the methodology is supported by published articles or papers that validate the approach used. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (in rejecting an tire expert's methodology, observing that there was no reference "to any articles or papers that validate [the expert's] approach"); *General Elec. Co. v. Joiner*, 522 U.S. 136, 144-45 (1997) (ruling that a district court properly excluded testimony by experts where the opinions were not sufficiently supported by the "studies on which they purported to rely"); *United States v. Rodriguez-*

15

*Felix*, 450 F.3d 1117, 1125-26 (10th Cir. 2006) (affirming the district court's exclusion of

a psychologist who had sought to testify about the reliability of eyewitness testimony

where the "description of [the psychologist's] research is wholly inadequate – it fails to

indicate whether it has been subjected to peer review, whether it has been published, and

whether it has been accepted by other psychologists in the field"); *Hammes v. Yamaha*

*Motor Corp. U.S.A., Inc.*, 2006 WL 1195907, at *9 (D. Minn. May 4, 2006) (permitting

an economist to testify where the "technique has been tested and employed by other

expert economists"); *Law v. NCAA,* 185 F.R.D. 324, 341 (D. Kan. 1999) (excluding the

proposed testimony of an economist where "the record contains no evidence that expert

economists do the job that Dr. Umback purported to do in his damage calculations").

    Even if Professor Fischel were testifying based on professional experience rather

than for his familiarity with economics, the Court would still need to rigorously assess the

reliability of the principles and methods he employed.  An expert cannot avoid rigorous

analysis by claiming expertise based on specialized knowledge.  The 2000 amendment to

Rule 702 "reject[ed] the premise that an expert's testimony should be treated more

permissively simply because it is outside the realm of science."  2000 Adv. Comm. Notes

to Fed. R. Evid. 702.  The Court may consider whether the expert's analysis of the issue

at hand "is of a kind that others in the field would recognize as acceptable."  *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137, 151 (1999); *see id.* at 152 (emphasizing that Rule 702

requires that "an expert, whether basing testimony on professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

### 4. The witness must apply the principles and methods reliably to the facts.

Rule 702 requires not only that the opinion must be "the product of reliable principles and methods," but also that "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702(3); *see* 2000 Adv. Comm. Notes to Fed. R. Evid. 702 ("The amendment [to Rule 702] specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case.").

The Court must find that the principles have been reliably applied all the way through from the beginning data to the final opinion. "'[A]ny step that renders the analysis unreliable ... renders the expert's testimony inadmissible.'" 2000 Adv. Comm. Notes to Fed. R. Evid. 2000 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (observing that testimony may be excluded if there "simply too great an analytical gap between the data and the opinion proffered").

### 5. The opinion must be based upon proper facts and data.

Yet another step in determining whether the opinion is reliable is examining the facts on which the proposed expert opinion is based. There are two applicable requirements. First, Rule 702 requires that an opinion must be "based upon sufficient

17

facts or data."  Second, Rule 703 provides that "in order for the opinion or inference to be admitted," the underlying facts or data relied upon must be"of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed. R. Evid. 703.

An expert thus should be excluded if he has not considered the facts that an expert in the field would properly consider before rendering an opinion.  *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir. 2002) (affirming the district court's exclusion of an economic expert on the ground that the expert "did not employ in the courtroom the same level of rigor that characterizes an expert in the field of economics and industrial organization," and noting that the economist had used unreliable data and had not conducted or cited relevant surveys); *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1237 (N.D. Ala. 2000) (excluding an economist's proposed testimony where the proponent of the testimony had "not cited any authority permitting an economist to create a geographic market without considering the locations, pricing practices, and transportation costs of other competitors").  Similarly, an expert may be rejected if he is not familiar with the facts necessary to render a proper opinion.  *Noel v. Martin*, 21 Fed. Appx. 828, 835 (10th Cir. 2001) (unpublished) (holding that a district court had properly excluded a proposed expert where, among other things, the expert was unfamiliar with certain key facts).

18

The Court also should exclude the expert opinion if the expert has relied on facts that are not supported by the record. *See Atlantic-Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1164-67 (10th Cir. 2000) (affirming the district court's exclusion of an economist where the district court had ruled that it was "not going to permit [the economist] to make assumptions and hypotheticals that conflict with the actual data"); *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000) (ruling that a district court abused its discretion in allowing an economist to testify where the economist's model "relied on several empirical assumptions that were not supported by the record"); *United States v. Swanquist*, 161 F.3d 1064 (7th Cir. 1998) (affirming a district court's exclusion of the testimony of an accountant where the accountant's opinion would have rested on a set of facts contrary to the evidence and was "clearly was intended to throw smoke in the jurors' eyes").

**D.      Fed. R. Evid. 403**

The Supreme Court has observed that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty of evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 exercises more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) (internal quotation marks omitted).  Rule 403 provides that even where evidence is otherwise admissible, it may be excluded if its probative value is substantially outweighed by other dangers, including "confusion of the issues, or

misleading the jury, or by considerations of undue delay."  District courts have broad

discretion to exclude expert testimony based on these concerns, as this Court has previous

noted.  *See* Docket No. 305 at 8-9 (discussing the dangers of misleading and confusing

the jury).

## II.   THE QUALIFICATIONS DISCLOSED FOR PROFESSOR FISCHEL

Defendant's updated disclosure sets forth the following description of Professor

Fischel under the heading "Qualifications":

> 1.      Daniel R. Fischel is President of Lexecon, a consulting firm
> that specializes in the application of economics to a variety of legal
> and regulatory issues.  He is also Professor of Law and Business at
> Northwestern University School of Law and Kellogg School of
> Management and the Lee and Brena Freeman Professor of Law and
> Business Emeritus at The University of Chicago Law School.  He
> has served previously as Dean of the University of Chicago Law
> School, as Director of the Law and Economics Program at The
> University of Chicago Law School, and as Professor of Law and
> Business at The University of Chicago Graduate School of Business.

> 2.      Professor Fischel's research and teaching have concerned the
> economics of corporate law and financial markets.  He has published
> approximately fifty articles in leading legal and economics journals
> on various issues relating primarily to the economics and regulation
> of financial markets.  He is coauthor, with Judge Frank Easterbrook
> of the Seventh Circuit Court of Appeals, of the book *The Economic
> Structure of Corporate Law* (Harvard University Press).  Courts of
> all levels, including the Supreme Court of the United States, have
> cited his articles as authoritative.  *See*, *e.g.*, *Central Bank v. First
> Interstate Bank*, 114 S. Ct. 1439 (1994); *Basic Inc. v. Levinson*, 485
> U.S. 224. 246 n.24 (1988); and *Edgar v. MITE Corp.*, 457 U.S. 624.
> 643 (1982).  His curriculum vitae, which contains a list of his
> publications, is attached hereto as Exhibit A.

3.      Professor Fischel has served as a consultant or adviser on economic issues to, among others, the United States Department of Justice, the United States Securities and Exchange Commission, The National Association of Securities Dealers, the New York Stock Exchange, the Chicago Board of Trade, the United States Department of Labor, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, and the Federal Trade Commission.

4.      Professor Fischel is a member of the American Economics Association and the American Finance Association.  He is also a former member of the Board of Directors of the Center for the Study of the Economy and the State at The University of Chicago, and former Chairman of the American Association of Law Schools' Section on Law and Economics.  He has testified as an expert witness in multiple proceedings in federal and state courts across the country, as detailed on his curriculum vitae.  His testimony has concerned a wide variety of financial issues including patterns of trading by insiders, the economics of diversification, the relationship between company disclosures and the total mix of information available to investors, materiality, and the determinants of stock price.  He has also testified as an expert on multiple occasions on behalf of the U.S. Department of Justice regarding various financial issues.

Ex. 1 at 1-3.  (The curriculum vitae are attached hereto as Exhibit 2.)

Professor Fischel's curriculum vitae shows that he has a law degree.  It does not show that he is actually a practicing economist, however.  His vitae shows that he has does not have any degree in economics, except for a minor in economics at the college level.  It shows that he has published numerous articles, but all were published in law reviews, with two exceptions – two articles about future contracts published in the mid-1980s (with one co-authored by an economist).

His curriculum vitae does not indicate that he has ever served as a financial analyst, a financial adviser, or a telecommunications specialist.  It also does not describe his consulting work. It does provide a lengthy list of case names in which he has provided affidavits, depositions, or trial testimony, but the vitae does not describe this testimony in any way besides providing a list of case names.[1]  In any event, the United States does not understand Defendant to be suggesting that Professor Fischel has relevant expertise because he has testified often.

## III.    THE SPECIFIC "EXPERT OPINIONS"

Paragraphs 5, 6, and 7 of the disclosure set forth the numerous opinions Professor Fischel proposes to state at trial.  *See* Ex. 1 at 3-9.

### A.    Paragraph 5 - Whether Defendant's sales were on the basis of material nonpublic information

Paragraph 5 begins with a general topic and a general opinion.  It states:

> Professor Fischel is expected to testify about Mr. Nacchio's holdings of and transactions in Growth Shares, Qwest options, and Qwest stock.  In particular, Professor Fischel is expected to testify that the economic evidence is not consistent with the Government's allegation that Mr. Nacchio's stock sales during the first two quarters of 2001 ("the Questioned Sales") were made on the basis of material nonpublic information.

Ex. 1 at 3.  Paragraph 5 then sets forth numerous "opinions," the common denominator of

---

[1]    Counsel understands that Professor Fischel has served as a damages expert for the United States in other cases.

which is that they all appear to relate to the broad topic of whether Defendant's stock

sales "were made on the basis of material nonpublic information." Each of these expert

opinions is addressed below.

### 1.      Paragraph 5A - Sales in prior quarters

Professor Fischel's opinion in Paragraph 5A is as follows:

> [Professor Fischel is expected to testify that ...] Mr. Nacchio's option
> exercises/stock sales during the first two quarters of 2001 are
> consistent with his pattern of option exercises/stock sales during
> 1998, 1999 and 2000.  These data show that in each quarter from the
> third quarter of 1998 through the second quarter of 2001, Mr.
> Nacchio exercised options that had been granted to him in June 1997
> and sold the shares he obtained from exercise.  Moreover, in certain
> quarters prior to 2001, Mr Nacchio exercised and sold a larger
> percentage of his exercisable holdings than he sold during the first
> two quarters of 2001.  These data contradict the Government's claim
> that Mr. Nacchio's "stock sales accelerated in January 2001 . . . ."

Ex. 1 at 4.  The Court should exclude this proposed "expert opinion."

First, this is essentially a statement of alleged facts.  Whether Defendant exercised

options in various quarters and how many he had left in each quarter are facts, not

opinions.  Professor Fischel lacks personal knowledge, and should not be permitted to

simply present and emphasize these facts.  *See* Fed. R. Evid. 602.

Second, even if the proposed testimony — that these facts show a consistent

pattern of option exercises by Defendant — might be considered expert testimony, it

would not be outside the jury's range of knowledge.  The testimony, as described by

Defendant, rests on just two facts:  the fact that Defendant exercised options for several

23

quarters, and how many options he did not exercise. The first fact requires no analysis

whatsoever. Arguably, the second fact requires division, but Professor's Fischel's ability

to do long division does not make him an expert. *See*

http://content.scholastic.com/browse/article.jsp?id=2116 (explaining that fourth graders

should be expected to "[b]e able to do more difficult long division problems" and also

explain their work). Defense counsel can easily present this inference to the jury, and has

raised it in the trial already.

Third, nothing in the disclosure suggests how Professor Fischel's qualifications are

relevant to this "opinion." If his "expert opinion" is to tell the jury that these facts show

that Defendant's sales did not accelerate, the disclosure does not describe any special

qualifications that Professor Fischel has that are relevant to such an opinion.

Fourth, there is no suggestion that Professor Fischel used any reliable economic

principles or methods in developing this opinion. *See* Fed. R. Evid. 702(2). And if he

has, Defendant has not described those reasons. *See* Fed. R. Crim. P. 16(b)(1)(C). This

"opinion" is simply a few facts. If the "opinion" is the additional inference that

Defendant's sales were "consistent," Defendant has failed to identify any reliable

economic principle of "consistency" that provides the basis for his inference. Defendant

appears to want the jury simply to take the word of Professor Fischel — because he is a

Very Important Person — as a basis for the conclusion that Defendant's sales were

"consistent."

24

Fifth, this testimony also poses a significant danger of confusing or misleading the jury.  If the jury is presented with the testimony of a law professor who opines on the "consistency" of the sales, the jury might well assume that the professor's views are the product of serious economic inquiry and application of economic models, and thus should be treated with more weight than the jury's own perceptions of the evidence.  *Cf. United States v. Call*, 129 F.3d 1402, 1406 (10th Cir. 1997) (affirming the district court's exclusion of polygraph evidence and noting "the danger that the jury may overvalue polygraph results as an indicator of truthfulness because of the polygraph's scientific nature").

### 2.    Paragraph 5B - Consistency of sales with stated preference

Professor Fischel's opinion in Paragraph 5B is in two parts.  The first part is as follows:

> [Professor Fischel is expected to testify that ...] The Questioned Sales are consistent with Mr. Nacchio's stated preference for receiving the January 2, 2001 Growth Share Payment in cash, because by selling the shares he received in settlement of the Growth Share Payment, Mr Nacchio converted those shares into cash.

Ex. 1 at 4.

The Court should exclude this proposed "expert" opinion.  First, this "opinion" is not within the scope of the March 16, 2007 disclosure.  That disclosure did not indicate that Defendant's alleged statements — such as his alleged "stated preference for cash" — would be a subject of Professor Fischel's testimony.  *See* Ex. 3 (March 16, 2007 expert

disclosure).

Second, this "opinion" is just some more alleged facts. This "opinion" simply juxtaposes the fact of Defendant's sales with his alleged stated preference for cash. This is not opinion testimony, but an attempt to highlight certain alleged facts for the jury. There is no indication that Professor Fischel is actually just assuming these facts to derive an expert opinion. *Cf. Champagne Metals v. Ken-Mac Metals*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006).

Third, if the "opinion" is that the sales are "consistent" with his alleged stated preference for cash, this is not an opinion that is outside the range of knowledge of the jury. The point appears to be that a stated desire for cash is consistent with converting stocks into cash. Defense counsel can easily present this inference to the jury, and has already done so.

Fourth, it is not disclosed how Professor Fischel has any relevant knowledge that gives him a special ability to offer this opinion. *See Jamsports & Entertainment, LLC. v. Paradama Productions, Inc.*, 2005 WL 14917, at *10 (N.D. Ill. 2005) (excluding the proposed testimony of an economist who had reviewed various corporate communications, and explaining that "[t]here is nothing in [the economist's] expertise that suggests that he is any more competent than the average juror in interpreting these communications .... Such insights, as Judge Easterbrook noted in a similar context, 'are no part of the economist's armamentarium.'") (quoting *Mid-State Fertilizer Co. v.*

26

*Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989)).  Perhaps

Professor Fischel has an unusual familiarity with the desire for cash, but if so, such

expertise is not set forth in the disclosure.

Fifth, the disclosure does not set forth any reliable principles or methods"

Professor Fischel has used.  If his "opinion" is the inference that Defendant's sales were

"consistent" with his statement, Defendant has failed to identify any reliable economic

principle of "consistency" that provides the basis for his inference.

Sixth, this testimony, too, poses a significant danger of confusing or misleading

the jury.  As noted, the jury might well assume that Professor Fischel's views on

consistency are the product of serious economic inquiry and application of economic

models and thus should be treated with more weight than the jury's own perceptions of

the evidence.

### 3.    Paragraph 5B - Incentives to sell growth shares

The second part of Professor Fischel's opinion in Paragraph 5B is as follows:

> [Professor Fischel is expected to testify that ...] ... Moreover, because
> the dollar value of the shares that Mr. Nacchio would receive in
> settlement of the Growth Share Payment did not depend on Qwest's
> stock price, the Growth Share Payment did not provide Mr. Nacchio
> with any incentive to not disclose material inside information or sell
> the shares he received in settlement of the Growth Share Payment on
> the basis of material inside information.

Ex. 1 at 4.

27

The Court should exclude this proposed "expert" opinion.  First, it is not within the scope of the March 16, 2007 disclosure.  That disclosure did not indicate that Professor Fischel would offer opinions on Defendant's incentives to sell the shares without disclosing the material inside information.  The only reference to any "incentives" was to "the role of Growth Shares as an incentive compensation device," but that topic clearly related to the role of Growth Shares in creating an incentive for Defendant to work at Qwest, rather than anything about whether Defendant had incentives, after receiving the growth shares, to sell them based on inside information.  *See* Ex. 3 at 1.

Second, this "opinion" is essentially a fact:  that the dollar value of the growth shares Defendant was to receive did not depend on the stock price.  Professor Fischel is not competent to offer this testimony.  *See* Fed. R. Evid. 602.

Third, the "expert opinion" that is proposed is certainly not an inference that is outside the range of competence of the jury.  Defense counsel has addressed these inferences about the growth shares numerous times in the trial already in cross-examination and opening.  The jury is surely competent to assess for itself whether Defendant would have wanted to sell the shares based on what he knew about Qwest's future.

Fourth, it is not disclosed how Professor Fischel has any special knowledge about these incentives that shows that he has expertise in this area.  There is nothing to suggest that Professor Fischel has any prior knowledge or experience with growth shares.

28

Fifth, it does not appear that Professor Fischel applied any reliable economic principles or methods in reaching this conclusion.  Nor does it appear that he has reliably applied any such principles to the relevant facts.  Indeed, it is notable that he does not even mention the point that if Defendant thought the stock was going to fall, that information would give him an incentive to sell.  This "opinion" is clearly not the product of the application of reliable economic principles.  It is one-sided lawyerly argument.

Sixth, this testimony poses a significant danger of confusing or misleading the jury.  As noted, the jury might well assume that Professor Fischel's views are the product of serious economic inquiry and application of economic models.  Also, to the extent that Professor Fischel would tell the jury about incentives that were not within the jury's common knowledge, such testimony poses a danger of misleading or confusing the jury.  For example, such "expert" testimony might improperly direct the jury's attention away from what Defendant's actual intent was and instead focus it on whether a professor would have found an incentive for Defendant's action.  *See United States v. Allerheiligen*, 221 F.3d 1353, 2000 WL 1055487, at *14 (10th Cir. Aug. 1, 2000) (unpublished) (affirming, based on Rule 403, the exclusion of a psychiatrist's testimony about the purposes of the defendant's marijuana use and observing that such evidence might "confuse and mislead the jury" because such expert testimony "will only rarely negate specific intent" and that "*presents an inherent danger that it will distract the jury from*

*focusing on the actual presence or absence of mens rea*") (emphasis added) (quoting

*United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990)).

Seventh, there is no foundation for the relevance of such testimony.  Even if there

had been a suggestion that Defendant actually performed an economic analysis of his

incentives, it is not relevant to have Professor Fischel present the hypothetical economic

incentives from his own academic perspective.

Eighth, allowing Professor Fischel to discuss these incentives would essentially be

an attempt to allow an expert to comment on Defendant's credibility.  Courts have

indicated that such expert commentary on credibility is improper.  *Cf. Nichols v.*

*American Nat'l Ins. Co.*, 154 F.3d 875, 883-84 (8th Cir. 1998) (ruling that a district court

erred in admitting the testimony of a psychiatrist who was to testify on such matters as

"recall bias" and "secondary gain," and explaining that "[o]pinions of this type create a

serious danger of confusing or misleading the jury, *see* Fed.R.Evid. 403," and that "[i]t is

plain error to admit testimony that is a thinly veiled comment on a witness' credibility").

The jury is entirely equipped to draw its own inferences about Defendant's credibility.

*Cf. United States v. Thomas*, 74 F.3d 676, 684 (6th Cir. 1996) (holding that the district

court properly excluded the testimony of an expert who was offered to testify about the

incentives a government witness would have to lie, because the "jury could fully

understand" those incentives without expert testimony), *abrogated on other grounds by*

*Morales v. American Honda Motor Co.*, 151 F.3d 500, 515 n.4 (6th Cir. 1998).

30

Ninth, testimony about Defendant's incentives may rapidly run afoul of Federal Rule of Evidence 704(b).  That rule bars an expert in a criminal case who is testifying with respect to the mental state or condition of a defendant from offering any opinion or inference "as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.  Such ultimate issues are for the trier of fact alone."  Testimony from Professor Fischel about what Defendant would have wanted to do presents a serious risk of intruding on the jury's role of assessing Defendant's mental state, in violation of this rule.

### 4.      Paragraph 5C - consistency of sales with alleged prior statement and Board's request

Professor Fischel's opinion in Paragraph 5C is as follows:

> [Professor Fischel is expected to testify that ...] The Questioned Sales are consistent with Mr. Nacchio's public statement at an investment community conference call on October 31, 2000 that he would be selling "about a million" share per quarter obtained from the exercise of options granted to him in 1997 and Qwest Board's request that Mr. Nacchio avoid bunching sales during and at the end of the exercise period of the 1997 options.

Ex. 1 at 5.

This expert opinion should be excluded.  First, it is beyond the scope of the March 16, 2007 disclosure.  There was nothing in that disclosure that suggested that Professor Fischel would be addressing the topic of Defendant's statements or the Board of Directors' alleged statements, and their consistency with his sales.  *See* Ex. 3.

Second, this "opinion" is simply fact testimony.  Defendant again wants Professor Fischel to state a few selected facts to the jury.  Professor Fischel is not competent to do so.

Third, if the "opinion" here is whether the evidence is "consistent," it is not helpful to the jury.  The jury is competent to determine for itself whether certain evidence is consistent with other evidence.

Fourth, there is no suggestion that Professor Fischel has any special qualifications relevant to this "opinion."   Nothing in the description of his qualifications shows that he has any superior ability to opine on whether words are consistent with actions.

Fifth, this opinion about consistency is not the product of applying reliable principles to a proper set of facts.  There is no suggestion of any economic concept that permits a professor to assess the consistency of words with actions.

Sixth, for the reasons noted above, introducing an expert to testify about Defendant's "consistency" should not be permitted pursuant to Rule 403.

**5.      Paragraphs 5D, 5F, 5G, 5H - Defendant's incentive to sell more**

Professor Fischel's "opinions" in Paragraphs 5D, 5F, 5G, and 5H are similar. They all present facts, then make the observation that Defendant could have sold more stock in the first half of 2001.  Those paragraphs state as follows:

Professor Fischel is expected to testify that ...

* * *

32

D.      Mr. Nacchio retained substantial saleable holdings that he would have had an incentive to sell if he were trading on the basis of material adverse inside information.  In particular, at the beginning of 2001, Mr. Nacchio held Qwest stock directly and indirectly which he had obtained by exercising options and converting growth shares in prior years, but did not sell any of theses shares during the first two quarters of 2001.  In addition, Mr. Nacchio did not exercise any of the options he was granted in 1999, and Mr. Nacchio retained most of his vested options he held as a result of the 1997 grant.

F.      The 10b5-1 sales program Mr. Nacchio entered into on February 16, 2001 (the "First 10b5-1 Program") provided for the sale of only 11,5000 shares per day.  Mr. Nacchio would have had an incentive to sell more shares per day if he were trading on the basis of material adverse inside information.

G.      Mr. Nacchio terminated the First 10b5-1 Program on March 2, 2001 thereby reducing the number of shares sold per day from 11,500 to zero.  Mr. Nacchio would have had an incentive to continue selling pursuant to the program if he were trading on the basis of material adverse inside information.

H.      The 10b5-1 sales program Mr. Nacchio entered into on May 16, 2001 (the "Second 10b5-1 Program") provided for the sale of only 10,000 shares per day and only allowed sales if the price of Qwest stock was at least $38.  Mr. Nacchio would have had an incentive to sell more shares per day without a floor if he were trading on the basis of material adverse inside information.

Ex. 1 at 5-6.

These opinions should be excluded.  First, they are not within the scope of the

March 16, 2007 disclosure.  As noted, that disclosure did not indicate that Professor

Fischel would offer opinions on Defendant's incentives to trade based on material

adverse inside information.  The only reference to any "incentives" was to "the role of

Growth Shares as an incentive compensation device," but that topic clearly related to the role of Growth Shares in creating an incentive for Defendant to work at Qwest. *See* Ex. 3 at 1. Nothing in that original disclosure suggested that Professor Fischel would opine on Defendant's incentive to sell more stock than he actually did. *See id.*

Second, these opinions are essentially a series of facts, strung together for effect. They recite Defendant's stock and options sales (and non-sales) in 2001, each followed by the same conclusion — that if Defendant had material adverse inside information, he would have had an incentive to sell more. Professor Fischel is not competent to testify as to these facts. *See* Fed. R. Evid. 602.

Third, the "expert opinion" that is buried in these facts — that Defendant arguably would have had an incentive to sell more stock if he had adverse information — is certainly not an inference that is outside the range of competence of the jury. "He could have sold more" is a simple inference, and defense counsel has raised it in the trial already. The jury is competent to assess whether, under all the circumstances, Defendant would have wanted to sell more than the $101 million he sold.

Fourth, it is not disclosed how Professor Fischel has any special knowledge about the general incentives of insider traders, or about the particular inside information that Defendant knew, that demonstrates that Professor Fischel has special expertise that enables him to express these opinions.

Fifth, it does not appear that Professor Fischel applied any reliable economic principles or methods in reaching this inference.  Nor does it appear that he has reliably applied any such principles to the relevant facts.  Indeed, it is notable that Professor Fischel does not even mention that Defendant, if he wished to either follow the law or avoid detection, would have had a significant countervailing incentive not to sell more of his holdings.  These "opinions" are again not the product of the application of reliable economic principles; they are just defense counsel's arguments.

Sixth, this testimony poses a significant danger of confusing or misleading the jury.  As discussed above, the jury might well assume that Professor Fischel's views are the product of serious economic inquiry and application of economic models.  As noted, evaluating these incentives is within the jury's range of competence.  And to the extent that Professor Fischel would tell the jury about incentives that were *not* within common knowledge, such testimony would pose a danger of confusing the jury, and might improperly focus the jury's attention on whether a professor could find an incentive for Defendant's action.  Also, allowing Professor Fischel to discuss these incentives would essentially allow him to comment improperly on Defendant's credibility.  Further, as noted above, testimony about what Defendant would have wanted to do also may quickly run afoul of Federal Rule of Evidence 704(b).

The United States observes that allowing Professor Fischel to offer an "expert opinion" that Defendant would have had an incentive to sell more if he held adverse

35

inside information would be akin to allowing Professor Fischel to testify in a shoplifting

case that the shoplifter would have had an incentive to steal a two-liter bottle of pop from

the convenience store rather than a one-liter bottle.  This point — *i.e.*, "if you were

stealing, you could have stolen more" — is not relevant, reliable, and helpful expert

opinion.  It should not be misleadingly presented to the jury as the "expert" opinion of an

academic in order to lend it a veneer of respectability.  If this argument is to be made, it

can readily be made by defense counsel.

### 6.     Paragraph 5E - Defendant's incentives in BellSouth transaction

Professor Fischel's opinion in Paragraph 5E is as follows:

> [Professor Fischel is expected to testify that ...] Qwest's Board
> approved the repurchase of approximately 22.22 million shares of
> Qwest stock from BellSouth for $45 per share on January 15, 2001
> following a discussion "led" by Mr. Nacchio and concluded that the
> "repurchase would be in the Corporation's best interest, and in the
> best interests of its stockholders."  The repurchase is inconsistent
> with the claim that Mr. Nacchio (and other members of the Board)
> possessed material adverse inside information at this time. Mr.
> Nacchio and other members of Qwest's board had no incentive for
> Qwest to repurchase its own shares at inflated prices because they
> would be inflicting losses on themselves and all other Qwest
> shareholders by doing so.

Ex. 1 at 5.

This expert opinion should be excluded.  First, while this paragraph does set forth

an opinion — that Defendant would not have an incentive for the repurchase if he

possessed material adverse inside information — there is no suggestion of how Professor

Fischel is qualified to offer this opinion.  Professor Fischel is not represented to have any special knowledge of Qwest, or of the transaction at issue, or of stock repurchases in general.

Second, there is no description of the reasons for this opinion.  *See* Fed. R. Crim. P. 16(b)(1)(C).  This disclosure simply sets forth the conclusion, without any description of how Professor Fischel reached that result.

Third, the disclosure does not set forth any "reliable principles and methods" that Professor Fischel might possibly have used in reaching his conclusion about Defendant's incentives in this particular transaction.  *See* Fed. R. Evid. 702(2).  There is no disclosure of any economic analysis.  Indeed, the disclosure is revealing in what it does not address. For example, the disclosure does not even purport to address the obvious fact that the repurchase would have raised Qwest's stock price, resulting in additional gains to Defendant if he sold in the short run from selling at higher price.  Also, a reliable analysis would need, at a minimum, to distinguish Defendant's personal incentives from the incentives of others.  It is clear from the disclosure that this basic distinction was not made, as it discusses the incentives  of "Mr. Nacchio and other members of Qwest's board" without any attempt to separate the two.

Fourth, there is no suggestion that Professor Fischel has reviewed "sufficient facts or data" to render this opinion, let alone data "of a type reasonably relied upon by experts in the particular field."  *See* Fed. R. Evid. 702(1), 703.  Notably, in the listing of

documents reviewed by Professor Fischel, there is no suggestion that he reviewed *any* materials underlying the BellSouth transaction.  It is highly unlikely that an economist would set forth a rigorous expert opinion on management incentives relating to a particular transaction without even reviewing the transaction.  *Cf. Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir. 2002); *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1237 (N.D. Ala. 2000).

Fifth, as discussed above, such expert testimony about Defendant's economic incentives should be excluded as irrelevant and misleading.  *See* Fed. R. Evid. 401, 402, 403.  There is no evidence that Defendant actually ever considered and calculated the difference between the short-term gains to himself of the inflated price against the potential long-term harm to his other unvested shares from the lower price that might result from a loss of value.  If Professor Fischel were to offer expert opinions to the jury about incentives that were not within the jury's common knowledge, such testimony would pose a danger of confusing the jury, and might improperly focus their attention away from Defendant's actual mental state and instead on whether a professor is able to discern any economic incentive for Defendant's action.  Allowing Professor Fischel to discuss this incentive would also essentially allow him to offer improper comment on Defendant's credibility.  Further, as discussed above, testimony about what Defendant would have wanted to do also may violate Federal Rule of Evidence 704(b).

### 7.    Paragraph 5I - Sales are consistent with diversification.

The expert opinion in Paragraph 5I is as follows:

> [Professor Fischel is expected to testify that ...]  The Questioned
> Sales are consistent with the economics of diversification because
> Mr. Nacchio's investment portfolio was not diversified.  Under these
> circumstances, Mr. Nacchio would have had an incentive to sell
> Qwest stock even if he believed that the value of Qwest stock
> exceeded the market price because selling Qwest stock reduced
> portfolio risk.

*See* Ex. 1 at 6.  This opinion should be excluded.

First, this opinion extends beyond the topics set forth in the March 16, 2007

disclosure.  The word "diversify" does not appear, in any form, anywhere in that

disclosure.  *See* Ex. 3.

Second, the disclosure does not set forth any qualification that Professor Fischel

has that grants him a special ability to determine whether Defendant's investment

portfolio was "diversified."  Professor Fischel's curriculum vitae does not show that he

has ever worked as a financial adviser (like David Weinstein), nor does it identify any

other relevant knowledge or experience.

Third, there is no indication that any of the conclusions set forth in this paragraph

are the product of reliable principles and methods.  For example, there is no explanation

of what methodology Professor Fischel used to determine that "Mr. Nacchio's investment

portfolio was not diversified."  The disclosure simply sets this forth as a fact to be

testified about by Professor Fischel, without a hint of any standard or analysis.

This conclusory conclusion — that Defendant was diversified — then serves as the basis for another one, that Defendant "would have had an incentive to sell Qwest stock even if he believed that the value of Qwest stock exceeded the market price because selling Qwest stock reduced portfolio risk." *See* Ex. 1 at 6.  But again, there is no hint of any reliable principle or analysis, other than the reference to the impressive-sounding but wholly unexplained "economics of diversification."  Even assuming that there is such an "economics," it is clear that before an economist could possibly determine that there was an incentive to diversify, the economist would need to consider and calculate numerous independent variables, such as the transaction costs of diversification, the expected gain, the expected decrease in risk, the investor's comfort with risk, and so on.  Nothing in the disclosure describes such an analysis, let alone that such analyses are reliable and that such a reliable analysis has been undertaken and reliably applied to the facts at issue.

Finally, even if the Court speculates that Professor Fischel indeed selected a reliable economic analysis and applied it reliably to the facts, the conclusion would not be helpful to the jury.  There is no indication that *Defendant* ever undertook such an economic analysis.  Professor Fischel's academic opinion is irrelevant, and also presents a significant danger of misleading and confusing the jury, as discussed above.

### 8.   Paragraph 5J, 5K - Sales by others

Professor Fischel's opinions in Paragraph 5J and 5K are similar in that they present facts about other individuals' sales of stock.  They state as follows:

[Professor Fischel is expected to testify that ... ]

* * *

J.      Many officers, directors, and employees of Qwest sold Qwest stock during the period when the Questioned Sales occurred, and in many cases, these sales constituted a larger percentage of saleable holdings than the Questioned Sales.

K.      Professor Fischel is expected to testify that ... Senior officers of Qwest and other public companies (including, for example, Michael Dell, Michael Eisner, Bill Gates, Ted Turner and Sandy Weill) frequently exercised options and sold substantial amounts of stock during the period from 1998 to 2001 (when Mr. Nacchio was selling Qwest stock).

Ex. 1 at 6.

These "opinions" should be excluded.  First, they are not truly statements of expert opinion, but are mere allegations of fact.  Professor Fischel is not competent to testify as to these facts.  *See* Fed. R. Evid. 602.

Second, these statements are not relevant to this case.  There is no indication of how this "opinion" about unidentified others at Qwest is probative of whether or not Defendant traded on the basis of material nonpublic information.  Indeed, this statement is so vague as to be useless, given that Qwest had tens of thousands of employees during the period in question; Defendant's statement does not identify a single one.  With respect to others at other companies (with a few identified as examples), it is even harder to see how this fact is relevant to any issue in this case.

41

Third, to the extent that these statements suggest some expert opinion, it is not clear what that opinion is, or the bases and reasons for it.  *See* Fed. R. Crim. P. 16(b)(1)(C).

Fourth, there is no indication that Professor Fischel has any specialized knowledge that enables him to offer such an opinion.

Fifth, given that no opinion is described, there is of course no indication that Professor Fischel reached the opinion by applying reliable principles and methods to an adequate and correct set of facts.

Sixth, these statements, if uttered by Professor Fischel in the form of an expert opinion, present a substantial danger of misleading and confusing the jury.  The jury would be likely to assume that these statements were both reflective of a careful and rigorous economic analysis by Professor Fischel and probative of Defendant's state of mind.  Neither assumption would be correct.

Moreover, introducing such evidence would require the United States to set forth the reasons distinguishing these other executives's sales, which would require a mini-trial with respect to each individual.  This process would be a serious waste of the jury's time. *Cf. C.A. Assocs. v. Dow Chem. Co.*, 918 F.2d 1485, 1490 & n.8 (10th Cir. 1990) (in a products liability case relating to a building, affirming the district court's decision under Rule 403 to exclude evidence relating to other buildings and explaining that "we agree

that the potential for delay and confusion could multiply with each additional building

offered into evidence").

**B.     Paragraph 6 - Qwest guidance and performance**

Paragraph 6 begins by identifying a topic of Professor Fischel's testimony, stating:

> Professor Fischel is expected to testify about the guidance Qwest
> provided during 2000 and 2001 in relation to its subsequent
> performance as well as the effect, if any, of Qwest's guidance on
> Qwest's stock price as well as analysts' recommendations, forecasts
> and target prices.

Ex. 1 at 6.  To the extent that this identification of a broad topic is intended to keep

Professor Fischel's options open, the United States objects to the disclosure as

insufficient under Rule 16(b)(1)(C), which requires disclosure of opinions, not topics.

**1.     Paragraph 6 - Consistency of performance with guidance**

Paragraph 6 next sets forth two statements of opinion.  The first is the following:

> Professor Fischel will testify that Qwest's performance during the
> first two quarters of 2001 (*i.e.*, the period in which the Questioned
> Sales occurred) was consistent with the guidance.

Ex. 1 at 6.  This opinion should be excluded.

First, this opinion does not fall within the broad topics identified in Defendant's

March 16, 2007 disclosure.  Nothing in that disclosure suggested that Professor Fischel

would address whether Qwest's performance was consistent with its guidance.  Rather,

the topic Defendant identified in that disclosure was the effect of the guidance.  *See* Ex. 3.

Second, this opinion — whether Qwest's performance for the first two quarters of 2001 was "consistent" with its guidance — is not an expert opinion.  It is an allegation of fact, as to which Professor Fischel lacks personal knowledge.  *See* Fed. R. Evid. 602.

Third, this "opinion" – which appears to be about Qwest meeting its external targets — is not testimony where an expert will assist the jury.  Whether Qwest met its targets is not evidence that is beyond the ability of the jury to understand absent expert testimony.

Fourth, there is no indication in the disclosure that Professor Fischel has any specialized knowledge that enables him to offer this opinion.  There is no suggestion that he is particularly good at determining that two numbers are consistent.

Fifth, there is no indication that this opinion — to the extent it is an opinion — is the result of reliable principles and methods.  As noted earlier, there is no economic principle or standard of "consistency" that has been identified.

Finally, this testimony should be excluded under Rule 403, for similar reasons to those set forth above.  It appears likely that the jury will be confused or misled if it is presented with Professor Fischel's personal views on consistency.

### 2.      Paragraph 6 - Failure to meet guidance reflected a massive downturn in the industry

The second opinion in Paragraph 6 is the following:

> He is also expected to testify that Qwest's failure to meet its guidance during the second half of 2001 does not demonstrate that

Qwest's September 7, 2000 guidance (or Mr. Nacchio's subsequent reaffirmations of the guidance) was incorrect, but rather reflects the massive economic downturn in the telecommunications industry.

Ex. 1 at 6.  The disclosure indicates that Professor Fischel will testify to the following six

facts in support of this opinion:

More specifically, Professor Fischel is expected to testify that:

A.     Qwest's stock price declined when it announced its guidance on September 7, 2000.

B.     Most analysts did not change their recommendations target prices or forecasts after Qwest announced its guidance on September 7, 2000.

C.     Analysts had their own forecasts, and did not adopt Qwest's guidance as their forecast.

D.     Analysts' reports reflected an understanding that economic conditions could cause Qwest's financial performance to be worse than expected.

E.     Qwest's stock price did not decline significantly when it reduced its guidance on September 10, 2001.

F.     Many other telecommunications companies provided guidance to the investment community during 2000 and 2001 and reaffirmed previous guidance between December 2000 and May 2001.  Moreover, due to adverse changes in economic conditions, many telecommunications companies including Qwest reduced their guidance after May 2001.  Furthermore, many officers and directors of telecommunications companies sold company stock after guidance which ultimately turned out to be wrong had been provided to the investment community.

Ex. 1 at 7.  The Court should exclude this opinion – *i.e.*, that it was the massive economic

downturn in the telecommunications industry that caused Qwest to miss its guidance.

First, this "opinion" appears to be an avenue for Defendant to offer into evidence numerous facts of which Professor Fischel has no personal knowledge and that have nothing to do with whether Qwest's performance in late 2001 was the result of a massive downturn in the telecommunication industry.  Most of the facts he proposes to offer into evidence — Qwest's stock price performance after it raised guidance in September 2000, analysts' recommendations after that guidance was issued, analysts' forecasts and reports, the reaction of the market on September 10, 2001 when Qwest reduced its guidance, and sales of stock by officers and directors of other telecommunications companies — have little or nothing to do with that alleged opinion.  This is no more than a collection of facts Defendant wants to introduce into evidence and has dressed up as "support" for an "expert opinion."  Professor Fischel cannot serve as an all-purpose fact-presenter. *See* Fed. R. Evid. 602; *cf. Champagne Metals v. Ken-Mac Metals*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006).

Second, Defendant has not disclosed the reasons for this opinion, as Rule 16 required him to do.  Listing a series of facts — most of which have nothing to do with whether Qwest's performance was the result of a industry-wide downturn — did not satisfy Defendant's clear obligation to provide the reasons and bases for the opinion.

Third, and relatedly, there is no disclosure of any "reliable principles and methods" that Professor Fischel may (or, more likely, may not) have used in determining whether

Qwest's performance in late 2001 was the result of a downturn in the telecommunication industry. *See* Fed. R. Evid. 702(2). There is no discussion of any methodology whatsoever, other than the listed facts. For example, there is no way to determine whether some telecommunication companies were considered more comparable to Qwest than others, and how those companies were weighted in any analysis.

Fourth, because there is no suggestion of any methodology used by Professor Fischel, it is also impossible to determine whether — even assuming a reliable methodology was used — the methodology was reliably applied to the facts. *See* Fed. R. Evid. 702(3).

Fifth, there is nothing to suggest that Professor Fischel has the specialized knowledge necessary to render this opinion. There is no indication that he has any particular familiarity with Qwest. In fact, it is an easy bet that at this point, the jury knows far more about the details of Qwest's performance in 2000 and 2001 than Professor Fischel does. Nor is there any suggestion in the disclosure that Professor Fischel has any particular expertise in analyzing the telecommunications industry. Telecommunications is a common area of specialization,[2] but there is no evidence that it

---

[2]      There are numerous economics professors who study the telecommunications industry, and some universities even have entire departments devoted to research on telecommunications. *See, e.g.,* http://www.indiana.edu/~telecom/directory.html; http://www.psu.edu/dept/comm/faculty/index.html; http://artsci.usfca.edu/graduate/economics/curriculum.html#6.

is Professor Fischel's specialty.

Sixth, the disclosure makes clear that Professor Fischel did not rely on "sufficient facts and data" or data "of a type reasonably relied upon by experts in the particular field." *See* Fed. R. Evid. 702(1), 703. The disclosure states that his conclusion that Qwest's performance was the result of a massive telecommunications downturn is "based on: (i) a comparison of the Qwest's [sic] September 7, 2000 guidance with Qwest's actual performance during 2000 and 2001; (ii) analysis of the investment community's reaction to Qwest's September 7, 2000 guidance; [and] (iii) a comparison of Qwest's guidance history during 2000 and 2001 with the guidance history of other telecommunications firms." *See* Ex. 1 at 6-7. There is nothing to suggest that a true economist would be able to make a rigorous determination about whether Qwest's performance was linked to the industry based on these facts alone. For example, this disclosure indicates that Professor Fischel did not even examine the *actual performance* of any telecommunications firms other than Qwest in reaching this opinion; instead, he considered only their *guidance*. Nor is there any indication that Professor Fischel examined the extent to which Qwest's actual business depended on the performance of others in the industry, a fact that he would need to have considered before he could conclude that Qwest's fortunes in late 2001 resulted solely from a general industry downturn.

Professor Fischel's failure to rely on relevant facts is confirmed by a review of his specific proposed testimony. For example, he proposes to testify that "Qwest's stock

price declined when it announced its guidance on September 7, 2000." *See* Ex. 1 at 7.

There is no description of how this fact supports his opinion about how Qwest's 2001

performance resulted from a massive economic downturn in the telecommunications

industry. Nor is there any discussion of the other details that an economist would need to

evaluate the stock price. For example, there is no indication of what time period

Professor Fischel focused on, and whether he took into account the well-known

phenomenon of "post-earnings announcement drift" – the well-established and still

unexplained phenomenon in which positive and negative news about earnings takes

several months to be fully reflected in the stock price.[3] In short, Professor's Fischel's

opinion — which is no more than some unrelated facts and a conclusion — is entirely

conclusory and should be excluded. *Cf. Blue Dane Simmental Corp. v. American*

*Simmental Corp.*, 178 F.3d 1035 (8th Cir. 1999) (affirming the district court's exclusion

of an agricultural economist who conducted a "simplistic" analysis of a market price" and

noting that there was "no evidence in the record that other economists use" the same

model that he did).

   Similar lack of rigor is reflected in the rest of his proposed testimony. For

example, Professor Fischel proposes to tell the jury that some other companies reaffirmed

---

[3]     *See, e.g,* K. Anderson *et al.,* "Opinion Divergence and Post-Earnings
Announcement Drift" (2007) at 1 (noting that this post-announcement drift is well
documented and "lasts for up to nine months"), available at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=969736.

guidance in 2001, and many officers and directors in other companies sold stock after guidance had been provided. However, the disclosure leaves undisclosed the name of any of those companies or officers. Nor is there any suggestion that Professor Fischel has examined the basis for why those unidentified other companies reaffirmed their guidance, or why those unidentified individuals sold stock.

Seventh, whether Qwest's performance in late 2001 was the result of a massive downturn in the telecommunication industry has no relevance to this case, at least without far more sophisticated analysis.

Eighth, this testimony – and the underlying facts that Professor Fischel proposes to present to the jury — presents a significant danger of confusing or misleading the jury. In addition to the Rule 403 concerns noted above with respect to other parts of Professor Fischel's proposed testimony, there are also other concerns here. Professor Fischel's primary bases for his opinions appear to be (1) analysts' reactions to Qwest's guidance, and (2) actions by other unidentified telecommunications companies and officer and directors at those companies. Professor Fischel should not be permitted to introduce this analyst information secondhand. And to the extent that Professor Fischel proposes to testify about practices by the other companies and officers and directors at those companies, whatever conceivable relevance such testimony might have is outweighed by the dangers of confusing and misleading the jury, as well as by the waste of time that

would result if the jury were to be subjected to multiple mini-trials on those collateral

issues.

###    C.    Paragraph 7 - Information regarding magnitude of IRUs would not have been material to a reasonable investor

The disclosure sets forth the following statement of opinion in paragraph 7:

> Professor Fischel is expected to testify that the economic evidence does not establish that information concerning the magnitude of Qwest's IRU revenue would have been material to reasonable investors on the dates of the Questioned Sales. This opinion is based on Professor Fischel's analysis of: (i) the economics of recurring and non-recurring revenues; (ii) the profitability of IRU transactions; (iii) Qwest's projected future sales of IRUs; (iv) the market valuations of telecommunications companies that engaged in IRU transactions as compared to the market valuations of telecommunications companies that did not; (v) the disclosure practices of other telecommunications companies that sold IRUs; and (vi) the pattern of sales by insiders of other telecommunications companies that sold IRUs.

Ex. 1 at 7-8. The disclosure then delineates more specifically the testimony to be offered

by Professor Fischel in support of this opinion. It states:

> In particular, Professor Fischel is expected to testify that:
>
> A.    The value of any firm is equal to the present value of the expected future cash flows from the operations of the firm. Therefore, the value of any particular revenue source depends on both the cost of generating the revenues, and the likelihood of future revenues. Transactions that result in revenues in the current period only may be more valuable than transactions that result in "recurring" revenues in many periods depending on profit margins, and the projected ability of the firm to engage in similar "non-recurring revenue" transactions in future periods.

51

B.      Qwest's IRU transactions were much more profitable than its "recurring" revenue transactions as many analysts stated.

C.      During the period of the Questioned Sales, Qwest projected that it would continue to sell IRUs in future periods.

D.      During the period of the Questioned Sales, the revenue multiples of telecommunications companies that sold IRUs generally exceeded the revenue multiples of telecommunications companies that did not.

E.      Several telecommunications companies that sold IRUs did not disclose the magnitude of their sales.

F.      Several reporting persons of these telecommunications companies sold stock during the period in which the Questioned Sales occurred.

Ex. 1 at 8-9.  This proposed testimony should be excluded.

First, the proposed testimony is on a topic that was not within the scope of any of the many topics set forth in the March 16, 2007 disclosure.  That March 16 disclosure did *not* suggest in any way that Professor Fischel would address the profitability of IRUs, let alone whether such IRUs would have been material to a reasonable investor.[4]

Second, this opinion testimony again appears to be — except for the brief economic discussion set forth in paragraph 7A — no more than a series of alleged facts

---

[4]      The solitary mention of IRUs in the prior disclosure was a statement about whether other companies had disclosed their IRUs.  It stated, in relevant part:  "Professor Fischel may testify about the disclosures made by Qwest and other telecommunications companies concerning recurring and nonrecurring sources of revenue.  Professor Fischel may testify that companies that sold IRUs did not always disclose separately the amounts of IRUs sold."  *See* Ex. 3 at 2.

that Defendant wishes to have Professor Fischel present to the jury.  These alleged facts are not ones within Professor Fischel's personal knowledge, and he should not be permitted to channel them to the jury as if he were competent to testify abut them based on personal knowledge.  Nothing in the disclosure suggests that Professor Fischel is simply assuming these facts to be true for purposes of an economic analysis.  *Cf. Champagne*, 458 F.3d at 1080 n.4.

Third, nothing in the disclosure suggests that Professor Fischel has any specialized knowledge that would allow him to opine on whether IRU revenue would have been material to reasonable investors.  *See* Fed. R. Evid. 702.  There is no description of any experience he has ever had with IRUs before this case.  Nor is there any description of any experience he has with investors that shows that he is particularly able to comment on what such investors would have found material.

Fourth, the disclosure does not set forth the reasons and bases for Professor Fischel's opinion that IRUs would not have been material to the reasonable investor.  *See* Fed. R. Crim. P. 16(b)(1)(C).  There are vague references to "profit margins" of IRU transactions and "revenue multiples" of other companies, but there are no details at all that would allow even a wild guess at his analysis.  Which IRUs?  Which other companies?  Professor Fischel also proposes to tell the jury that several persons at other telecommunications companies also sold stock during early 2001, but does not identify a single person or company by name.

Fifth, the disclosure does not set forth any reliable principles or methods that were used in reaching this opinion. *See* Fed. R. Evid. 702(2). One might speculate that the methodology might be mathematical and have something to do with profit margins and revenue multiples, but even assuming that is correct, there is no suggestion of how these variables actually fit together, let alone whether such a methodology is reliable. As noted, Professor Fischel also proposes to rely on the stock sales of unidentified individuals at other companies, but there is not a whisper of an explanation of how these other sales could possibly show, through a reliable methodology, that a reasonable investor would not consider Qwest's IRUs material.

Sixth, the disclosure does not suggest that if there was a reliable methodology, Professor Fischel has reliably applied that methodology to the facts. *See* Fed. R. Evid. 702(3). As noted, the disclosure mentions some possible variables. However, there is nothing in the disclosure that shows that these variables were correctly determined by Professor Fischel and then incorporated into a reliable model or method. With respect to revenue multiples, it is not hard to see that it is not proper economic analysis to simply compare the revenue multiples of telecommunications companies  with IRUs to those that did not. One could just as easily compare the revenue multiples of companies with names in one half of the alphabet to those in the other half of the alphabet and conclude, voila, that there was a difference. There is nothing to suggest that Professor's Fischel's methodology — to the extent there is one — was reliable.

In any event, Professor Fischel's conclusion cannot possibly be reliable. The "facts" set forth in the disclosure suggest, if anything, that IRUs could be quite significant. If so, that fact does not support Professor Fischel's conclusion that Qwest's IRU revenue would not have been material to investors.

Seventh, the disclosure makes clear that Professor Fischel did not rely on "sufficient facts and data" or data "of a type reasonably relied upon by experts in the particular field." *See* Fed. R. Evid. 702(1), 703. For example, as to how the IRUs would impact the value of Qwest, he suggests that it would necessary to consider the projected ability of the firm to engage in similar transactions and the profit margins on the transactions. He then proposes to testify that Qwest's IRUs transactions "were much more profitable than its 'recurring' revenue transactions as many analysts stated," and that "[d]uring the period of the Questioned Sales, Qwest projected that it would continue to sell IRUs in future periods."

These are not even facts; they are vague generalizations. There is nothing to suggest than any economist could perform any reliable analysis starting from these generalizations. Moreover, these generalizations are contrary to the record. As the Court is aware, there has ample trial testimony that (1) Qwest's internal projections were that IRUs were going to dry up in the second half of 2001, and (2) by the first half of 2001, IRU transactions had often become less profitable because they involved "swaps" rather than outright sales. Because the disclosure does not suggest where any support for these

55

generalizations might be found, Professor Fischel should not be permitted to state them to the jury as part of his "analysis." *See Atlantic-Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1164-67 (10th Cir. 2000); *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3d Cir. 2000).

The "facts and data" upon which Professor Fischel relies regarding other companies' revenues are even more obviously inadequate. The disclosure does not indicate that he has reviewed those other companies' revenues and earnings (or, where applicable, their *restated* revenues and earnings). Professor Fischel cites just two facts in his discussion of revenue multiples. Those two facts themselves show that his factual basis is inadequate to render a proper opinion. In Paragraph 7D, he alleges that during early 2001, the revenue multiples of unidentified companies that sold IRUs exceeded those that did not. But then in Paragraph 7E, he alleges that several companies that sold IRUs did not disclose the magnitude of their IRU sales. It is hard to see how a comparison of the revenue multiples of firms that sold IRUs with those that did not can have any meaning if the market was not even aware of the magnitude of the IRUs. In other words, paragraph 7E makes clear that paragraph 7D is unreliable. In any event, Professor Fischel does not give any reasons for why his ultimate opinion — about what would be material to a reasonable investor — can properly rest on these facts.

Eighth, this testimony from Professor Fischel poses a significant danger of misleading and confusing the jury. If Professor Fischel is permitted to testify regarding

what a reasonable investor would have considered material, the jury is likely to assume

that he has some special economic insight into the notion of materiality, and may defer to

his testimony.  Assuming that Professor Fischel's testimony would reflect some economic

analysis, it would confuse and mislead the jury, as it might lead them to believe that his

conclusory pronouncements on these facts reflect deep thoughts and thus should guide

their decision.

## III.    THE COURT SHOULD EXCLUDE THE TESTIMONY.

The Court should exclude Professor Fischel's testimony.

### A.    Defendant has not complied with the disclosure requirements.

As set forth above, Defendant has not adequately complied with Rule 16's

requirements for any of the "opinions" he proposed to offer through Professor Fischel.

He has not set forth the reasons and bases for his opinions, and in many cases has also

attempted to expand the subjects of his testimony beyond even the broad topics set forth

in his March 16, 2007 disclosure.

The Court has previously set forth the factors relevant to Section 16 sanctions, in

its March 22, 2007 Order addressing the United States's proposed expert testimony on the

hard drive expert.  *See* Docket No. 295 at 8-12.  Those Rule 16 factors support exclusion

of Professor Fischel's testimony.

First, Defendant has had ample time to obtain an adequate expert report.  As

Defendant has himself emphasized, the issue of experts arose at the outset of this case,

back in December 2005. Defendant did not retain Professor Fischel in order to respond to any designation of a similar expert by the United States, and could have retained Professor Fischel as an expert at any time. Defendant's expert disclosure was not due until March 16, 2007 — only one business day before trial — and was entirely inadequate. The Court then provided Defendant with an additional *thirteen* days — well into the trial — to provide a clearer disclosure. As explained above, the updated disclosure still does not satisfy the rule.

Second, there would be substantial prejudice in allowing Professor Fischel to testify. As noted, the disclosure provided by Defendant contains entirely new areas of proposed testimony not within the topics of the March 16, 2007 disclosure. Even where the proposed areas of testimony are within the topics set forth in the March 16 disclosure, the disclosure still fails to "describe" the opinions and the "bases and reasons" for those opinions, as Rule 16 requires. The inadequacy of this disclosure — which is, incidentally, far less informative than the typical expert report in a run-of-the-mill medical malpractice case — prevents counsel from adequately preparing for cross-examination. It is well past the eleventh hour, as the trial has long been underway and the United States is prepared to soon complete its case in chief. Professor Fischel could be on the stand in a few days. The United States also notes that this testimony is vastly more expansive in scope than the proposed report of the examination of two documents on a hard drive, which the Court concluded prejudiced Defendant where the report was

disclosed twenty-one days before trial.  *See* Docket No. 295 at 9-10.

Third, a continuance would not be fair to the parties or the jury.  Any continuance would need to be substantial:  Defendant would need to prepare a proper disclosure that meets the requirements of Rule 16; the United States would need an opportunity to review that disclosure and would likely move for exclusion of some or all of the proposed testimony as inadmissible; Defendant would surely want an opportunity to respond; the United States would need to review Professor Fischel's underlying materials; the Court would likely need to hold an evidentiary hearing; and then the Court would need to issue specific rulings as to each of the opinions Defendant proposes to offer through Professor Fischel.  An extended continuance thus would be necessary, but is unjustified in light of the scheduling considerations in this trial, which the Court has previously noted.  *See* Docket No. 295 at 10-12.

**B.      The testimony is inadmissible on numerous grounds.**

Even if the Court determines that the disclosure was adequate, the Court should rule that Defendant has not established its admissibility.  The burden is on Defendant to establish by a preponderance of the evidence that Professor Fischel's testimony is admissible.  *See* 2000 Adv. Comm. Notes to Fed. R. Evid. 702 (explaining that pursuant to Federal Rules of Evidence 702 and 104(a), "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of

the evidence."). For the many reasons set forth above, Defendant has not met this test

with respect to any of the proposed opinions.

      **C.**    **If the Court is inclined to permit any testimony by Professor Fischel, it should grant additional disclosure and then hold an evidentiary hearing.**

The United States believes that the Court should exclude Professor Fischel based

on the inadequacy of the disclosure and the clear inadmissibility of the testimony. If,

however, the Court is inclined to allow any portion of the proposed expert opinion

testimony discussed above based on the disclosures to date, the United States respectfully

requests a hearing prior to the admission of such testimony in order to challenge its

admissibility out of the presence of the jury. *See Dodge v. Cotter Corp.*, 328 F.3d 1212,

1229 (10th Cir. 2003) (taking note of "*Daubert*'s requirement that *some* reliability

determination must be made by the trial court *before* the jury is permitted to hear the

evidence") (emphasis in original) (quoting *Mukhtar v. California State Univ.*, 319 F.3d

1073, 1074 (9th Cir. 2003)); *Goebel v. Denver & Rio Grande W. R. Co.*, 215 F.3d 1083,

1088 (10th Cir. 2000) ("[W]e specifically hold that a district court, when faced with a

party's objection, must adequately demonstrate by specific findings on the record that it

has performed its duty as gatekeeper.").

In addition, the United States requests that in advance of any such hearing,

Professor Fischel should provide the reasons and bases for his opinions. The March 29,

2007 disclosure did not provide any of the information upon which Professor Fischel

purports to have relied.  Instead, it simply listed categories of information that Professor

Fischel (or his staff) have reviewed.  Many of these categories are incredibly broad and

potentially include tens of thousands of documents.  *See* Ex. __ at 9-10.  The United

States should be permitted an opportunity to review these documents in advance of any

evidentiary hearing.

## CONCLUSION

For the numerous reasons set forth herein, the United States respectfully requests

that the Court exclude the testimony of Professor Fischel.

Respectfully submitted this <u>3rd</u> day of April, 2007.

TROY A. EID
UNITED STATES ATTORNEY

s/Kevin T. Traskos
Cliff Stricklin
James O. Hearty
Kevin Traskos
Assistant U.S. Attorneys
United States Attorney's Office
1225 17th Street, Suite 700
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0400
E-mail: cliff.stricklin@usdoj.gov
          james.hearty@usdoj.gov
          kevin.traskos@usdoj.gov

s/Colleen Conry
Colleen Conry
Senior Litigation Counsel
Leo Wise
Trial Attorney
United States Department of Justice
1400 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 514-0658
Fax: (202) 514-0152
E-mail: Colleen.Conry@usdoj.gov
          Leo.Wise@usdoj.gov
          Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this  3rd  day of April, 2007, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Herbert J. Stern
dpenna@sgklaw.com

John M. Richilano
jmr@rglawoffice.net gmiller@rglawoffice.net

Marci A. Gilligan
mgilligan@rglawoffice.net gmiller@rglawoffice.net

Edward S. Nathan
enathan@sgklaw.com lspector@sgklaw.com

Joel M. Silverstein
jsilverstein@sgklaw.com

Jeffrey Speiser
jspeiser@sgklaw.com

Alain Liebman
aliebman@sgklaw.com

*Ma-Linda Stevens*
Ma-Linda Stevens
United States Attorney's Office
1225 17th Street, Suite 700
Denver, Colorado 80202
Telephone: 303-454-0100
Fax: 303-454-0404

63