## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 05-cr-00545-EWN

UNITED STATES OF AMERICA

      Plaintiff,

v.

JOSEPH P. NACCHIO,

      Defendant.

---

## MOTION TO PERMIT EXPERT REBUTTAL OF, OR, ALTERNATIVELY, TO STRIKE, OPINION TESTIMONY BY WITNESSES JOHNSTONE AND KHEMKA ADDUCED BY THE GOVERNMENT IN CONTRAVENTION OF THE COURT'S PRIOR ORDER AND MEMORANDUM OF DECISION LIMITING THEIR TESTIMONY [#305]

---

Joseph P. Nacchio, by and through undersigned counsel, moves for leave to present expert testimony by Daniel Fischel to rebut certain opinion testimony of government witnesses Johnstone and Khemka adduced by the government in contravention of this Court's March 26, 2007 Order and Memorandum of Decision Limiting Testimony of Financial Analysts [#305] (the "3/26/07 Order"). Alternatively, only if this relief is not granted, Mr. Nacchio moves to strike all such testimony of Messrs. Johnstone and Khemka, and all exhibits introduced in connection with their testimony that reflect such opinions.

1

## BACKGROUND

As this Court has observed, this case requires the jury to decide whether, at the time Defendant sold certain stocks, he possessed material, nonpublic information. 3/26/07 Order at 2.[1]   The heart of the government's case is that, during the period he was trading in the first half of 2001, Mr. Nacchio knew, and the public did not, the quantitative extent to which Qwest's revenues were derived from so-called "non-recurring" or "one-time" transactions, as distinct from so-called "recurring" transaction, and that this information was "material."

*The 3/26/07 Order*:  In response to the government's representation in its trial brief that it anticipated offering testimony from investment analysts regarding the "significance of insider information that was not publicly disseminated" while Mr. Nacchio made the trades here at issue, including testimony about whether such information was (1) public and (2) material to a reasonable investor, we moved to exclude the testimony on the ground that it was irrelevant and in the nature of expert testimony.  *See* Nacchio 3/8/07 Trial Brief and 3/21/07 Motion to Exclude Testimony By Analysts and Purported "Victims" [#288].   The government opposed, arguing that the proposed testimony was relevant and based on the analysts "personal knowledge." 3/26/07 Order at 4, 5-6.

---

[1] As this Court has also observed, a statement or omission is material only if a reasonable investor would consider it important in determining whether to buy or sell stock.  3/26/07 Order, *citing Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).  Whether the information is material depends on other information already available to the market; unless the statement or omission "'significantly altered the 'total mix' of information' available, it will be considered immaterial." *Id.* (*quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 [1976]).

In the 3/27/07 Order, the Court limited the testimony of the government's analysts to *lay* testimony which both (1) concerned whether certain information in the case was "non-public" and (2) related "'historical facts' based on the Analysts' personal experience."  3/27/07 Order at 2-5.

The Court excluded any testimony by the analysts "regarding what information about Qwest they would have considered 'important'" (i) as "irrelevant" (*id.* at 6-7); (ii) because to testify in this regard the analysts would have to be "qualified as experts" and the government had undeniably "failed to provide notice of such expert testimony as required... and is thus prohibited from having the Anaysts testify as experts" (*id.* at 8); and (iii) because, even if relevant, such testimony would be excluded "on the basis of being prejudicial and likely to confuse the issues under Federal Rule of Evidence 403," since it "would pose a significant danger of misleading the jury into believing that it should judge materiality from the perspective of a highly trained financial analysts rather than from the perspective of a reasonable investor," and, "in turn, would pose a danger of prejudice to Defendant, because the jurors may erroneously conclude 'that they were not the best qualified to assess the [materiality of the information at issue], that they should second guess their own judgment, and that they should defer to the Government's [Analysts]'" (*id.* at 8-9) (citation omitted).

### *The Analysts' Testimony in Contravention of the 3-26-07 Order*.

Notwithstanding the Court's order prohibiting the analysts from providing

3

*any* testimony concerning what information about Qwest they considered important, the government proceeded to present testimony in the nature of expert opinion testimony from both of their analysts – Messrs. Johnstone and Khemka –  concerning the importance each attributed to the alleged material non-public information at the heart of the government's case against Mr. Nacchio: the extent to which Qwest's financial results were derived from "IRUs," "Swaps," and other so-called "non-recurring" or "one-time" business, as distinct from "recurring" business. Indeed, as detailed below, both analysts *far* exceeded the limitations on their testimony set in the 3/26/07 Order, characterizing Qwest's non-recurring income "meaningless" and of no value whatsoever in valuing Qwest and its stock, and opining that Qwest's failure to *quantify* the extent of its non-recurring business during the first half of 2001 dramatically affected the value of the company and its stock.

Preliminarily, by way of purported "background," the government proceeded to establish the education and expertise of Messrs. Johnstone and Khemka concerning financial and company analysis, asset management, the markets, and the telecommunications industry – just as one would were they being qualified as expert witnesses. *See* Tr. 2173-76 (Johnstone's qualifications); Tr. 2265-66 (Khemka's qualifications).[2]

---

[2] Notably, over our objection, Johnstone testified that "on three separate occasions, the Wall Street Journal recognized me as one of the best on-the-street analysts for the year in question, 2001.  I was ranked by the Wall Street Journal as the best fixed mind telecom analyst in the U.S." Tr. 2175:9-2176:12.  Similarly notable among Khmka's "qualifications" testimony, was his (footnote cont.)

*Johnstone*. Over our objections, Johnstone was permitted to flatly contravene the 3/26/07 Order by testifying not only as to his opinion that the precise extent of Qwest's "non-recurring" IRU revenue in the first and second quarters of 2001 was "important" to him as an analyst, but even more remarkably as to his opinions that (i) such non-recurring revenue had *no value whatsoever* in valuing Qwest and its stock,[3] (ii) his "*view of the company* had changed now that [he] had full disclosure" in August 2001 of the extent of such revenue, and (iii) that this information "warranted a change in rating and point of view on the company." Tr. 2201:11-2203:19.

Further, in the course of Johnstone's testimony, the Court admitted, over our objection, the first paragraph and all but the last sentence of the second of Government Exh. 745, which contravened the 3/26/07 Order by reiterating these same expert opinions. Gov. Exh. 745; Tr. 2204:25-2207:12. Significantly, in admitting these portions, the Court *incorrectly* stated that:

---

assertion that "as an analyst covering telecom services sector," he was "*an expert* on the sector." Tr. 2265:1-5 (emphasis added).

[3] Tr. at 2202:5-24:

> ...[I]n the first quarter of 2001, Qwest published in their press release that they grew revenue 12 percent. But investors, including Davenport investors, did not know that that figure included over $400 million of one-time optical capacity revenue, which *if you look at recurring revenue, the company actually grew its revenue 7-1/2 percent year over year, not 12 percent.*
>
>             *          *          *
>
> ...[T]he company had been touting that they're growing revenue at 12 percent in the first and second quarter of 2001. And in fact, that was not the case... *their growth rate was 7-1/2 percent.*

(Emphasis added)

the reason I excluded this, frankly, had nothing – it *didn't have to do with the weight of the evidence, the relevancy of the evidence*. It would be because he would be testifying as an expert, and he Government didn't adequately disclose his expert status to the defense.  So that's why I excluded the opinion testimony in the first place, the expert opinion testimony.

Tr. 2206:8-14.  (Emphasis added.)

The record is clear, however, that in excluding the analysts' testimony concerning what information about Qwest they considered important, the Court explicitly relied on its holdings that such testimony was "irrelevant" and, if admitted, would be unduly prejudicial and confusing under Fed. R. Evid. 403. 3/26/07 Order at 6-7 (exclusion based on relevance); 8 (exclusion under FRE 403 based on prejudice and confusion).  *See also* Tr. at 2250:17-2251:24 (where the Court refused to allow us to inquire on cross-examination concerning the extent to which other analysts agreed or disagreed with views Johnstone expressed on his direct examination as to the importance of Qwest's non-recurring revenues and the company's disclosure/non-disclosure of them in 2001).

*Khemka*.  Over our objections, Khemka was permitted to contravene the 3/26/07 Order by testifying not only as to his opinion that the extent of Qwest's "non-recurring," "one-time" revenues in the first and second quarters of 2001, was "important" to him as an analyst, but also as to his opinions that (i) non-recurring revenues "were *not meaningful* when we look at as an investor versus... recurring, *genuine* revenues" (Tr. 2284:4-6) (emphasis added); (ii) that Qwest's Swap transactions were "bogus" (Tr. 2284:25-2286:4); and (iii) that

"revenue quality" is considered "good" if it is recurring and "poor" if it is non-recurring (Tr. 2289:18-2290:1).

**I.   MR. NACCHIO SHOULD BE PERMITTED TO PRESENT EXPERT TESTIMONY BY PROFESSOR DANIEL FISCHEL TO REBUT THE EXPERT OPINION TESTIMONY OF THE GOVERNMENT'S ANALYSTS CONCERNING THE SIGNIFICANCE OF QWEST'S NON-RECURRING REVENUES TO THE VALUE OF QWEST AND ITS SHARES IN THE 'TOTAL MIX' OF PUBLICLY AVAILABLE INFORMATION**

As detailed above, the government's analysts opined that they Qwest's non-disclosure of the extent of its non-recurring income was material negative information which caused them to reduce their opinion and valuation of Qwest and its stock.  While this Court has ruled that the analysts' personal opinions in this regard are irrelevant and impermissibly prejudicial and confusing, as the record stands, that is all the jury has on how *anyone* values such non-recurring information.  To rebut this testimony, Mr. Nacchio should be permitted to adduce evidence as to the nature of, and distinction between, recurring and non-recurring revenue, and as to the relationship between both types of revenue and the value of a company and its securities.  We propose to do this in two ways:

*First*, through an economic study comparing the revenue multiples of telecommunications companies that disclosed non-recurring revenues during the relevant period with those that did not disclose such revenues, to test whether, as the government and its analysts contend, companies that disclosed such

revenues had a lower revenue multiple, which would reflect that investors collectively, perceived them as less valuable than recurring revenues.[4]

*Second*, by presenting the contemporaneous views of other analysts, who reached very different opinions from Messrs. Johnstone and Khemka about the significance of the non-disclosure of the IRUs on the value of Qwest and its stock. This would blunt the irrelevance, prejudice, and confusion on a record that currently includes only one of the several views of the matter expressed by analysts at the time, and also help effectuate the requirement that materiality be judged upon the "total mix" of publicly available information.

The materials required by Fed. R. Crm. P. 16 concerning Professor Fischel's proposed expert testimony were all provided to the government on or before Saturday morning, April 7, 2007.

---

[4] The Court should also permit this expert testimony because it was previously proffered in Professor Fischel's expert report of March 29, 2007. *See* id. p. 7-9. On this one of the several areas of Professor Fischel's proffered testimony, we ask the Court to reconsider its exclusion of the testimony: (1) we believe that the presentation *on this particular point* (*id.* ¶ 7) was more than adequate to satisfy the requirements of Fed. R. Cr. P. 16(b)(1)(C); and (2) in excluding Professor Fischel's testimony on this point based on *Kumho* reliability considerations, the Court overlooked the requirement that, while it is not "specifically mandated" to use the normal *Daubert* hearing to fulfill its "gatekeeper" function, the court must have sufficient evidence to perform "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," and to develop a sufficient record "in order to allow a determination of whether the district court properly applied the relevant law." *See, e.g.*, *Goebel v. Denver and Rio Grande Western RR*, 215 F.3d 1083, 1087-88 (10th Cir. 2000). An evidentiary hearing is particularly appropriate where, as here, the court believes the experts' report was insufficiently detailed. *See U.S. v Call*, 129 F.3d 1402, 1405 (10th Cir. 1997).

## II. ALTERNATIVELY, THE TESTIMONY OF MESSRS. JOHNSTONE AND KHEMKA ABOUT WHAT INFORMATION ABOUT QWEST THEY CONSIDERED IMPORTANT, OR THE SIGNIFICANCE OF SUCH INFORMATION SHOULD BE STRICKEN

Should the Court refuse to permit Professor Fischel to present the rebuttal expert testimony we request, we request alternatively that, for the reasons set forth in the 3/26/07 Order, the testimony of Messrs. Johnstone and Khemka concerning what information about Qwest they considered important and the significance of such information be stricken.

Respectfully submitted this 7th day of April, 2007.

s/Herbert J. Stern
Herbert J. Stern
hstern@sgklaw.com

Jeffrey Speiser
jspeiser@sgklaw.com

Edward S. Nathan
enathan@sgklaw.com

Alain Leibman
aleibman@sgklaw.com

Mark W. Rufolo
mrufolo@sgklaw.com

Stern & Kilcullen, LLC
75 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-1900
(973) 535-9664 (facsimile)

s/John M. Richilano
John M. Richilano
jmr@rglawoffice.net

Marci A. Gilligan
mgilligan@rglawoffice.net

Richilano & Gilligan, P.C.
633 17th Street, Suite 1700
Denver, CO 80202
(303) 893-8000
(303) 893-8055 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of April 2007, a true and correct copy of the foregoing **DEFENDANT JOSEPH P. NACCHIO'S MOTION TO PERMIT EXPERT REBUTTAL OF, OR, ALTERNATIVELY, TO STRIKE, OPINION TESTIMONY BY WITNESSES JOHNSTONE AND KHEMKA ADDUCED BY THE GOVERNMENT IN CONTRAVENTION OF THE COURT'S PRIOR ORDER AND MEMORANDUM OF DECISION LIMITING THEIR TESTIMONY [#305]** was served on the following via email:

James O. Hearty
james.hearty@usdoj.gov
victoria.soltis@usdoj.gov
USACO.ECFCriminal@usdoj.gov

Cliff Stricklin
Cliff.stricklin@usdoj.gov

Leo J. Wise
leo.wise@usdoj.gov
dorothy.burwell@usdoj.gov

Colleen Ann Conry
colleen.conry@usdoj.gov

Paul E. Pelletier
paul.pelletier@usdoj.gov

Kevin Traskos
kevin.traskos@usdoj.gov

s/Candy J. Jones
Candy J. Jones