IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 05-cr-00545-MSK

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JOSEPH P. NACCHIO,

        Defendant.

---

## ORDER DENYING MOTION FOR NEW TRIAL

---

This matter comes before the Court on the Defendant's Motion for a New Trial Pursuant to Federal Rule of Criminal Procedure 33 (**#532**), the Government's response (**# 561**), and the defendants reply (**#570**). Having reviewed and considered the record, the parties' briefing, and the applicable law, the Court finds as follows.

**I.     ISSUE PRESENTED**

In 2007, the Defendant, the former chief executive officer of Qwest Communications International Inc. ("Qwest"), was convicted on multiple counts of insider trading. He is currently in the custody of the Federal Bureau of Prisons, serving a sentenced term of incarceration.[1]

---

[1] The Defendant was sentenced to a term of 72 months of imprisonment. Finding that the sentencing court had erred in calculating the amount of loss, the Court of Appeals reversed that sentence and remanded the matter for resentencing. *United States v. Nacchio*, 573 F. 3d 1062 (10th Cir. 2009).

    At the time the Defendant filed the instant motion for new trial, appeals from his sentence remained outstanding, rendering the motion premature pursuant to Fed. R. Crim. P. 33(b)(1). However, the Court of Appeals has since remanded the action, and the instant motion for new

In the motion now before the Court, the Defendant contends that he is entitled to a new trial of his case based on newly-discovered evidence, pursuant to Fed. R. Crim. P. 33. Specifically, he contends that deposition testimony of Robin Szeliga, Qwest's former chief financial officer, given in a civil action, is different from testimony she gave at trial in this case, and that the difference in testimony is sufficiently significant to warrant a new trial. The Government disagrees.

The Defendant has requested an evidentiary hearing on this motion, but the Court finds no need for a hearing. Ms. Szeliga's trial testimony and a transcript of her deposition testimony are both before the Court. In resolution of this motion, there are no disputed facts to be determined.

## II.   ANALYSIS

Fed. R. Crim. P. 33 authorizes a trial court to grant a new criminal trial of a case if "the interests of justice" so require.[2] Because the Defendant argues that he is entitled to a new trial based on Ms. Szeliga's deposition testimony a civil case some two years after the conclusion of the Defendant's criminal trial, a description of Ms. Szeliga's testimony in each context is appropriate.

---

trial is now properly before this Court.

[2] Although courts have broad discretion in determining Rule 33 motions for new trial, such motions are generally disfavored and are viewed with great caution, as there is a public interest in bringing litigation to a close and preventing delay in imposing just sentences. *See generally Herrera v. Collins*, 506 U.S. 390, 399 (1993); *United States v. Redcorn*, 528 F.3d 727, 743 (10th Cir. 2006).

### A. Ms. Szeliga's Testimony in This Action

For the Defendant to be convicted for insider stock trades, he had to be aware of material[3] information that the public did not have. As relevant here, the charges against the Defendant were premised, in part, upon warnings given by Ms. Szeliga to the Defendant (but which were not disclosed to the public) of the possibility that Qwest would not reach its financial targets for 2001. Ms. Szeliga testified, both at trial and in her subsequent deposition, with regard to warnings that she made to the Defendant ( but which the public did not have).

The materiality of Ms. Szeliga's warning depend, in part, on the size of the gap between the revenue target and Ms. Szeliga's projections. Qwest maintained two different revenue targets – an internal target figure, used only within the company, and a target figure that the it disclosed to the public. Because these targets differed, the significance of the risk associated with not meeting them also differed. If Ms. Szeliga's warning was made with reference to the internal target figure, the risk was a potential $300 million shortfall, representing 1.4% of Qwest's total revenues; on the other hand, if the warning pertained to the publicly disclosed target figure, the risk was a potential $900 million shortfall, or 4.2% of total revenues. The Defendant contends that information about a potential 1.4% shortfall, a warning based upon the internal target, would not be sufficiently "material" to support the Defendant's conviction for securities fraud.

The risk of Qwest's underperformance was disclosed to Ms. Szeliga in a September 2000

---

[3]Inside information is deemed "material" if there is a substantial likelihood that a reasonable investor would find that disclosing the information would significantly alter the total mix of information available to the market. *See TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

memorandum addressed to her - the Bickley Memo.[4]  During the criminal trial, Ms. Szeliga testified about the Bickley Memo at length, explaining the nature of the numerical figures that appeared in the document and their significance.  Ms. Szeliga consistently maintained that she did not show the Bickley Memo to the Defendant, but she warned him based on it.  However, Ms. Szeliga's testimony was not clear as to which target figures she referred in warning the Defendant.

On direct examination and cross examination Ms. Szeliga referred to internal targets. She testified that certain employees were "very concerned that they could not meet the targets," and that she and her subordinates "aggregated all the risk they were identifying" and came to a sum of "a billion dollars of risk as it related to the target that we had set."  (**# 561**, Ex. 4 at APP-2134.)  She also talked about a $1.59 billion risk posed to the internal targets:

> A. Using a target of $22 billion for revenue, the estimate at this time by Mr. Bickley and the financial planning group was – the target of $22 billion would have about $1,592,000,000 of risk with regards to making that $22 billion target.
>
> Q. And the $22 billion target, do you recall where that came from?
> A. That was a rounding up of the original discussion of targets that [the Defendant, certain other Qwest employees,] and I had.
>
> Q. Is that an internal target or external target?
> A. Excuse me, that is an internal target.

(**# 561**, Ex. 4 at APP-2126-2127.)

On cross-examination, Ms. Szeliga testified that the risk mentioned in the Bickley Memo

---

[4] The Bickley Memo was written by Steve Bickley and Pat Pritchard, two subordinates to Ms. Szeliga then working within Qwest's financial planning and analysis section. At the time of the Bickley Memo, the internal target figure was approximately $22 billion and the publicly disclosed target figure, $21.6 billion. (**# 561**, Ex. 4 at APP-2127.)  Later,, the internal target was later lowered to $21.8 billion and the publically disclosed target figure ranged between $21.3 and $21.7 billion. (**#561**, Ex. 4 at APP-2424.)

was one billion dollars and, again, referred to Qwest's internal targets.

> Q. Okay.  Now, when you were talking about a billion dollar risk that all of these folks were debating and discussing, that was a billion dollar risk in their view at the time to the internal budget which was $21,991,000,000.  That's true, isn't it?
> A. In the – yes, in the original, we showed that as it rounded up to $22 billion.

(**# 561**, Ex. 4 at APP-2268).

However, on redirect examination, Ms. Szeliga discussed her warning in the context of the publicly disclosed, or "street," target figure.

> Q. So the internal target was $22 billion, according to this memo; is that right?
> A. Yes.
>
> Q. Okay. And then there is a $400 million difference between that target and what this says was the street disclosure; is that right?
> A. Yes.
>
> Q. Okay. I think you called that the cushion before; is that right?
> A. Yes.
>
> Q. And that comes down to 21.6 billion. And we'll just call that – I think this memo calls it the street disclosure, so I'll use that. . . that same description?
> A. That's fine.
>
> Q. Okay. And in this memo, if you can highlight the 1,192,000, 000, what does Mr. Bickley describe that as?
> A. Grand total risk in street disclosures, 1,192,000,000.
>
> Q. I'm going to round that to 1.2 billion; is that fair?
> A. Yes.
>
> Q. And I'm going to call that risk.  So when I take the street, according to this memo, 22 [billion dollars] minus the risks, what do I come to?
> A. 20 billion .4.
>
> Q. 20.4 billion, all right. Street minus the risk is 20.4 billion.  And I want to compare that to the guidance that [the Defendant] gave to the street two days after this, okay.
> \*       \*       \*
> Q. And how does this number, 20.4 billion, compare to the low end of the guidance that Mr. Nacchio disclosed to the street?

A. About $900 million lower.

(**# 561**, Ex. 4 at APP-2422-2424.)

### B.  Ms. Szeliga's Deposition Testimony

Approximately two years later, Ms. Szeliga was deposed in connection with a related civil suit being brought by the Securities Exchange Commission.  When asked about the Bickley Memo, Ms. Szeliga noted that she did not have "a specific recollection" about any discussions of the memo or the warnings that she gave to the Defendant.

> Q. Do you remember telling the FBI that at some point during the budgeting process, [a Qwest employee] came to you and said that there might be $900 million worth of risk to the budgeted number?
> A. Yeah.  Generally, I think he came to me with a big number like that.  Again, I'd have to look at the documents again to try to refresh my memory.
>
> Q. Did you communicate to [the Defendant] in the December [2000] or January [2001] time period a risk number?
> A. Yes, I believe I did.
>
> Q. Okay. Now, I want to be clear about where that risk number came from because I think there's been some confusion about it.
> A. Okay.
>
> Q. The number that you went to [the Defendant] with was what?
> A. My general recollection is I was talking to [the Defendant and another Qwest executive officer] about a billion dollars of risk in the plan.
>
> Q. In the budgeted plan, correct?
> A. In the 2001 budget.
>
> Q. So –
> A. Against the target.
>
> Q. Okay. So that the risks that you had totaled up relative to the target meant that the budget – the actual number, if things didn't go right, could have been as low as $21 billion?
>
> A. I don't recall the specifics of the numbers.

        \*    \*    \*

> Q. . . . I want to know what you remember telling [the Defendant]?
> A. I remember talking about approximately a billion dollars of risk in the plan to [the Defendant and another Qwest executive officer].
>
> Q. Okay.
> A. But I can't give you any more specifics than that.
>
> Q. A billion dollars in risk to the $22 billion plan that was in place, correct?
> A. I can't remember the number that was in place at the time, so – but that – from everything we've looked at, we were approximately at $22 billion of target action but, again, there's just not that level of recollection.

(**# 532**, Ex. H at 5-7 (Tr. 239-40)).

The Defendant contends that Ms. Szeliga's deposition testimony is new evidence establishing that: (1) the $900 million figure Ms. Szeliga mentioned in her redirect examination in trial came from a Qwest employee, not the Bickley Memo; and (2) the risk Ms. Szeliga warned the Defendant of pertained to the internal targets and represented a 1.4% total revenue shortfall.[5] Interpreted this way, the Defendant argues that the new evidence affects whether the warning given by Ms. Szeliga was material thereby requiring a new trial.

### C. The Defendant's Motion for New Trial

In the Tenth Circuit, a defendant seeking a motion for new trial under Fed. R. Crim. P. 33 based on newly discovered evidence must satisfy five requirements: (1) the evidence was discovered post-trial; (2) the failure to discover the evidence was not caused by the defendant's lack of diligence; (3) the new evidence is material to the principal issues involved; (4) the new evidence is not merely cumulative or impeaching; and (5) the new evidence would probably

---

[5]This Court is tasked not with determining whether this evidence is true, but with determining whether the interests of justice require a new trial so that this evidence might be presented.

produce an acquittal in a new trial. *See Redcorn*, 528 F.3d at 743-44; *United States v. Sutton*, 767 F.2d 726, 729 (10th Cir. 1985). The Defendant argues that Ms. Szeliga's deposition testimony fits all of these criteria; the Government counters that the testimony meets none of them. Because this matter can be resolved by examining the latter two factors, the Court limits its analysis thereto.[6]

### 1. Requirement that the Evidence not be Cumulative or Impeaching

A motion for new trial based on newly discovered evidence cannot succeed if the "new" evidence is merely cumulative or impeaching.[7] *See Redcorn*, 528 F.3d at 743-44. The Defendant argues that Ms. Szeliga's testimony is neither cumulative nor impeaching, because it clarifies which revenue target she referenced in her warning to the Defendant about shortfalls. The Government argues that the deposition evidence is both cumulative and impeaching because Ms. Szeliga took multiple positions in her trial testimony.

Although the parties disagree as to the significance of Ms. Szeliga's testimony, they agree as to its substance. There is no dispute that she was questioned and testified at length about the very issue upon which the Defendant bases his current motion – what it was that Ms.

---

[6] The Court will assume, *arguendo*, that the evidence was discovered after trial and that the belated discovery was not due to a lack of diligence. However, the Court notes its doubts as to the latter point, as Defense counsel had ample opportunity at trial to explore the issue in its cross-examination of Ms. Szeliga.

The Court will also assume, without necessarily determining, that the deposition testimony is material (relevant or pertinent) to the issue of the materiality (significance) of the information given by Ms. Szeliga to the Defendant.

[7] Cumulative evidence is additional or corroborative evidence that stands to prove something that has already been established by other evidence. *See* BLACK'S LAW DICTIONARY 455 (4th ed. 1968). Impeachment evidence is evidence adduced to call a witness's credibility into question. *Id.* at 886.

Szeliga said about risk of approximately one billion dollars in loss during a conversation she had with the Defendant. The parties do not dispute that Ms. Szeliga testified at length about the amount of risk and what figures it applied to in direct examination, during cross examination, and again, on redirect.[8] Ms. Szeliga gave testimony that suggested that she understood and communicated that the billion dollar risk applied to the internal target figures, but also gave testimony suggesting that she understood and communicated that it applied to the publicly disclosed target figures. Government and Defense counsel had ample opportunity to, and indeed did, explore this issue with her at trial. This exploration was precisely what lead to the apparent contradiction in Ms. Szeliga's testimony. The jury was presented with this conflict in the evidence and in the parties' arguments and was instructed to draw its own conclusions as to the conflict's significance.[9]

Ms. Szeliga's deposition testimony offers nothing that is substantially new. First, she expressed her concerns as to her limited recollection of events, as compared to trial testimony which was not so hesitant. In addition, she qualified her responses by noting that she had

---

[8]Indeed, the Defendant quotes from Ms. Szeliga's trial testimony to demonstrate that she articulated that the risk comparison was to the internal rather than the external targets, and that she never gave him the Bickley Memo.

[9]The jury was instructed as follows:
> The job of judging the credibility or the believability of each witness in this case and the weight to be given to the testimony of each witness is yours and yours alone. . . . A truthful witness may seem to be nervous and may seem to contradict himself or herself on the witness stand. . . . You should [] ask yourselves whether the witness's version about an event is the product of the sorts of innocent errors that I've just been discussing or whether the witness's version about an event is the result of an intentional falsehood.

prepared for the deposition only by briefly skimming though transcripts of testimony she gave before SEC on prior occasions and at the Defendant's trial and by "flipping through" some documents (**#561**, Ex. 32 at 176-77).  During questioning, she repeatedly stated that her recollection was not clear and that her memory had faded (**#561**, Ex. 32 at 269-70).  She had difficulty remembering details on much of the subject matter of her testimony, including the target figures themselves and conversations she had with the Defendant, including the conversation during which she warned him about the billion dollar risk (**#561**, Ex. 32 at 270-72).

Second, she did not recant her trial testimony.  To the contrary, Ms. Szeliga stated that during the trial she "tried to testify completely and fully and truthfully" (**#561**, Ex. 32 at 176-77).  Because Ms. Szeliga's trial testimony was inconsistent, and she did not purport to recant it in her deposition, the deposition testimony offers nothing new.  Arguably, it illustrates the same confusion as her testimony at the trial in this matter.

However, if the Court were to adopt the Defendant's characterization of Ms. Szeliga's deposition testimony – that she unambiguously communicated that the billion dollar risk applied to the internal target figures – such testimony would be both cumulative and impeaching.  It would be cumulative of that portion of her testimony at the criminal trial hat the warning related to internal targets, and impeaching of that portion of her redirect testimony that the warning related to public disclosures.  Indeed, because Ms. Szeliga's criminal trial testimony ultimately encompassed both halves of a binary proposition – either the warnings related to internal targets or they related to publicly disclosed targets – her deposition testimony on this point cannot be anything <u>but</u> cumulative or impeaching.  Because the deposition testimony only repeats some

portion of the testimony already given by Ms. Szeliga, the deposition testimony does not warrant a new trial.

### 2. Requirement that the Evidence Probably Lead to an Acquittal

In order to obtain a new trial, a defendant must establish that there is a reasonable probability that presenting the new evidence in trial would result in an acquittal. *See Redcorn*, 528 F.3d at 745 (affirming denial of a motion for new trial where jury had heard substantial amount of evidence on the issue in question and where new evidence was questionably material, impeaching, and cumulative).

Here, although the Defendant understandably construes Ms. Szeliga's deposition testimony so as to corroborate that portion of her trial testimony that was favorable to him, when viewed in its entirety, it merely perpetuates the inconsistency and ambiguity found in her trial testimony.

When Ms. Szeliga testified at trial, the jury was presented with ambiguous and conflicting evidence as to whether she warned the Defendant of a shortfall in revenue relative to the internal or external revenue figures. Ms. Szeliga's deposition testimony continues to be inspecific, vague and ambiguous in this regard. In addition, it is riddled with Ms. Szeliga's remonstrances discounting her failing recollection. For these reasons, the Court cannot find that there is a reasonable probability that presenting Ms. Szeliga's deposition testimony would result in an acquittal in this case.

### III. CONCLUSION

Based on the foregoing, it is **THEREFORE ORDERED** that the Defendant's Motion for New Trial (**#532**) is hereby **DENIED.**

Dated this 12th day of January, 2010

                                                 **BY THE COURT:**

*/s/ Marcia S. Krieger*

                                                 Marcia S. Krieger
                                                 United States District Judge